Hughes vs. The State.

---

Hughes, Plaintiff in error, vs. The State, Defendant in error.

*February 9 — February 26, 1901.*

*Criminal law and practice: Jurors: Qualification: Statements subsequent to verdict: Examination: Residence: Immaterial error: Murder: Dying declarations: Record: Presence of accused.*

1. In a prosecution for the murder of a woman who was an inmate of a house of ill fame, a juror, when examined upon the *voir dire*, stated that he lived about two blocks from the saloon where the shooting occurred, and that he had read about the matter in the newspapers and heard some discussion about it, but had not formed an opinion, and thought he could try the case fairly. During the trial the attorney for the accused informed the court that said juror had been in said saloon soon after the crime was committed. Thereupon the court examined him and he admitted having been in the saloon as stated, but denied having learned anything in particular about the case. No question concerning his presence in the saloon as stated was put to him upon the *voir dire*. Upon motion for a new trial affidavits were introduced tending to show that said juror was a frequenter of the disreputable house where the deceased lived; that he knew and was intimate with her; that he had stated soon after the shooting that the man who did it ought to be sent over the road; and that he was in the room where the shooting occurred while the body of the deceased still lay upon the floor. The juror admitted that he was in the saloon building as stated and that he had been at said disreputable house, but denied having been in said room or having known the deceased. *Held,* sufficient to support the conclusion of the trial judge that the juror was competent.

2. A verdict in a criminal case cannot be impeached by anything a juror says or does after its rendition.

Hughes vs. The State.

3. A person summoned as talesman is not disqualified by sec. 2525, Stats. 1898, from serving as a juror, by reason of having served upon the regular panel of a court of record in the same county within a year.

4. The fact that a person who has read about a crime in the newspapers states that, assuming the facts stated therein to be true, he has formed an opinion which would require evidence to remove, does not disqualify him from serving as a juror, if, notwithstanding said opinion, he thinks he can dismiss the impression and stand perfectly fair to the accused upon the evidence.

5. Questions which practically ask a juryman what he would or would not do under a supposed state of facts may properly be ruled out.

6. Where a person has a legal residence in the state, his statement upon examination as a juror that he has no *home* here, but lives at a hotel and is temporarily absent from the state a large part of the time, does not disqualify him.

7. Although twelve unchallenged jurors and no more should be in the box at all times while the jury are being examined, a failure in that regard does not constitute a material error, where it affirmatively appears that the error was corrected when attention was called to it, and that in the meantime nothing had been done except examine a juror without objection.

8. In a prosecution for murder evidence that on the day when the deceased made a statement tending to show that the killing was intentional, and prior to the time it was made, the deceased, although at times in a stupor, apparently understood what she was talking about, and conversed with others than the person to whom the statement was made concerning other matters requiring the exercise of memory and intelligence, stating to one person that she knew she could not get well and could not live long, is *held* sufficient foundation for the reception of said statement as a dying declaration; and the testimony of other witnesses that on said day the deceased was delirious and did not know what she was doing affects only the credibility of the statement.

9. The record on a trial for murder extending over several days affirmatively showed that the accused was present at the time of arraignment and plea, and at the opening of court, both forenoon and afternoon, on each day of the trial, up to and including the morning session at which the jury were charged and retired, and that he was present during the afternoon session of that day, both when the jury came in with a request for further instructions, and afterwards when such instructions were given. It also showed, under all reasonable inferences, that the jury came in and rendered their

verdict during the same afternoon session, and only a few minutes after receiving such additional charge. *Held*, a sufficient showing that the accused was present at the time the verdict was rendered.

ERROR to review a judgment of the circuit court for Douglas county: JAMES O'NEILL, Judge. *Affirmed*.

The plaintiff in error was convicted of the murder of May Bolz, and sentenced to imprisonment for life, and prosecutes this writ of error to reverse the judgment. The evidence showed that the accused was a young man twenty-five years of age, unmarried, and had been engaged about the railroad business, living in Superior, in what is known as the " Allouez Bay district," at the east end of that town; that for about a year and a half prior to October 3, 1899, he had been intimate with the deceased, who was an inmate of a house of ill fame in the city of Superior, in the Allouez Bay district, and that they had talked of being married; that the accused was out of work, and contemplated going to West Superior to obtain work in the railroad business, and, if he could not obtain employment there, talked of going West for that purpose; that the deceased knew of his plans with regard to leaving Superior; that the accused stayed with the deceased on the night of October 2d, and on the following day met her at about 2 o'clock in the afternoon at the saloon of one Barry, in the said district, and had some conversation with her about his plans, and whether she would accompany him. This conversation was held in a private wine room in the rear of the saloon, and, after it, the deceased came out, and joined some friends in another wine room, and a few minutes afterwards *Hughes* again called the deceased alone into another wine room, and, immediately after they had passed in, a number of shots were heard, and it was found that the deceased had been shot twice,— once in the right arm and once in the back, the last shot entering the sheath of the spinal cord, completely paralyzing the body from that point down; and that *Hughes*

Hughes vs. The State.

had then shot himself four times. The evidence tended further to show that *Hughes* was accustomed to carry a rusty revolver, and that the deceased knew it, and that *Hughes* had oiled and loaded the revolver that day; but *Hughes* claimed upon the trial that the shooting was accidental; that as they passed into the wine room the deceased felt the revolver in his coat pocket, and told him he was careless; and he said, "There's nothing in it," and, not remembering that he had oiled and loaded it, pulled it out, pulled the trigger, and it went off, and she fell back, saying she was dying; and he then said, "If you are, you will not die alone," and turned it on himself. The deceased lived until October 11th, when she died, having made an ante-mortem statement on Sunday, October 8th. The plaintiff in error recovered from his wounds. There was little, if any, evidence of ill will between the parties, but some evidence that she refused to go to West Superior with the accused, as he wanted her to do.

*John H. Vaughn*, for the plaintiff in error, contended, *inter alia*, that if a juror serves upon the regular panel of any court of record within a year, he is absolutely disqualified from serving as a juror in any cause within the same county for one year, the exception being that if he has served during the year as a talesman or on a special venire he is not disqualified from again serving during the same year on the regular panel, or as a talesman, or on a special venire. *First Nat. Bank v. Post*, 66 Vt. 237. Where a juror positively says that he has an opinion which it will require evidence to remove, he is disqualified by reason of that opinion. Thompson, Trials, § 80; *People v. Mather*, 4 Wend. 229; *Eason v. State*, 6 Baxter, 466–476; *Comm. v. Knapp*, 9 Pick. 496; *Cotton v. State*, 31 Miss. 504; *White v. Moses*, 11 Cal. 68; *Fahnestock v. State*, 23 Ind. 231; *Stephens v. People*, 38 Mich. 739; *Rothschild v. State*, 7 Tex. App. 519; *Collins v. People*, 48 Ill. 145; *Gray v. People*, 26 Ill. 344; *Cancemi v.*

*People,* 16 N. Y. 501; *Olive v. State,* 11 Neb. 1; *Polk v. State,* 45 Ark. 165; *Palmer v. State,* 42 Ohio St. 596; *People v. Thacker,* 108 Mich. 652; *McGuire v. State,* 76 Miss. 504; *State v. Ramsey,* 50 La. Ann. 1339; *People v. Wilmarth,* 29 App. Div. 612; *People v. Fultz,* 109 Cal. 258; *State v. Rutten,* 13 Wash. 203; *State v. Wilcox,* 11 Wash. 215; *State v. Murphy,* 9 Wash. 204.

For the defendant in error there was a brief by the *Attorney General,* and oral argument by *R. F. Hamilton,* second assistant attorney general.

WINSLOW, J.   A claim is made on behalf of the plaintiff in error that the verdict is contrary to the law and the evidence, but we consider the claim so palpably unfounded that we shall not undertake to discuss it at length. It is sufficient to say that, in our judgment, there was ample evidence to sustain the verdict.

The specific errors claimed will be considered under three heads.

1. Errors in the selection and impaneling of the jury. Under this head a number of points are made. A juror named Sanow, when examined on the *voir dire,* stated that he lived about two blocks from the Barry saloon in October, 1899; that he knew something of the matter from reading about it in the papers, and from hearing some discussion of it, but had not formed an opinion, and thought he could try the case fairly. The juror was accepted, and the trial proceeded. During the progress of the trial, Mr. Vaughn, the prisoner's attorney, informed the court that he had just been informed that Sanow was at Barry's saloon soon after the shooting, and was very much excited and affected when he heard of it. Thereupon the court examined Sanow, and he testified that he was in the saloon shortly after the shooting, but did not learn anything in particular about the case, and formed no opinion. The ques-

tion whether he was in the saloon had not been put to him
on the *voir dire*. The court then proceeded with the trial,
Sanow remaining upon the jury. After the verdict, upon
motion for a new trial, a number of affidavits of various
persons were introduced tending to show, among other
things, that Sanow was a frequenter of the house of ill
fame where May Bolz lived, and that he knew and was inti-
mate with her; that he had been heard to say, soon after
the shooting, that the fellow who did it ought to be sent
over the road; and that Sanow was in the wine room where
the shooting took place fifteen or twenty minutes after-
wards, and while the body of the deceased still lay on the
floor. Sanow's testimony was taken, in which he denied
substantially all of the facts alleged except that he ad-
mitted that he was in the saloon building, but not in the
wine room, and admitted that he had been twice in the
house where deceased lived, but denied knowing her. The
court concluded on this evidence that Sanow's testimony
was true, and that he was a competent juror. Upon a state
of facts quite similar, a like ruling was sustained by this
court in the case of *Schuster v. State*, 80 Wis. 107. The
same case also disposes of another exception as to the juror
Sanow. He was asked on cross-examination what he went
to the sheriff's room for after the verdict was rendered, and
an objection to the question was sustained. As held in the
*Schuster Case*, the verdict cannot be impeached by anything
which the juror said or did after the verdict was rendered.

Another juror, named Healy, was objected to as incom-
petent because he had served on the regular panel of the
superior court within the year, and because he stated that
he had formed an opinion in the case. Neither of the points
is well taken. Healy was summoned as a talesman, and
the very section which disqualifies a person from serving
as juryman twice within a year excepts from the rule the
case where a person is summoned as a talesman. Stats. 1898,

sec. 2525. As to his knowledge of the case, he said he had read of it in the newspapers, and that, assuming the facts stated in the papers were true, he had formed an opinion which would require evidence to remove; that notwithstanding this, he thought he could dismiss the impression and stand perfectly fair to the accused upon the evidence. The situation is substantially the same as that presented in *Baker v. State*, 88 Wis. 140, and for the reason there stated we hold that no error was committed.

Several jurors were asked whether, in case of a reasonable doubt in their minds as to the guilt of the accused, they would give him the benefit of such doubt, and whether they would give the accused the benefit of such a doubt as quickly as if the accused were a highly respectable gentleman; also whether they would be prejudiced against the accused if it developed that he was living with a woman not his wife, and whether they would follow their consciences or the judge's instructions; and other similar questions were put, all of which the court finally ruled out. There was no error in these rulings. While the questions might, perhaps, have been properly allowed, because the trial court has a large discretion as to the selection of a jury (*Sutton v. Fox*, 55 Wis. 531), the ruling of the court in refusing to allow them was clearly not error. They were questions which practically asked the juryman what he would or would not do under a supposed state of facts, and such questions may properly be ruled out. Thompson, Trials, § 102.

Objection is made to the juror Rogers because it is said his examination showed that he was not a qualified elector of this state. As to this it is sufficient to say that, while the testimony showed that he was away from the state a large portion of the time, it also showed that the absences were temporary, and always with the intention of returning. Stats. 1898, sec. 69, subd. 2. He was an unmarried man, and boarded at a hotel. It is true, that he stated that he

had no *home* here, but it is very evident that he meant by the word "home" a house or family residence. His other testimony showed him to have a legal residence here, and there was no error in allowing him to remain upon the jury.

. Objection is made because at one time during the impaneling of the jury only eleven unchallenged jurors were in the jury box, and at another time there were thirteen in the box. The accused was not required to challenge at either time, nor were any proceedings had except that the examination of jurors was proceeded with, and, as soon as attention was called to the situation, the blunder was corrected. The true rule is that the full number of twelve unchallenged jurors should be in the box at all times while the jury are being examined. *Lamb v. State*, 36 Wis. 424. This rule is important, and should be strictly observed by trial courts; and, had the accused been required to challenge when there were less or more than twelve unchallenged men in the box, it may be that a serious question would be presented; but when it affirmatively appears that he simply examined a juror without objection, and that the error was corrected, and the required number supplied, when attention was called to the matter, and he was not compelled to challenge or exercise any right in the absence of the proper number, it must be held that he suffered no prejudice, and he must be considered to have waived the objection. *Flynn v. State*, 97 Wis. 44.

2. As to the alleged dying declarations of May Bolz, which the court received against objection and exception. This declaration was shown to have been made on the afternoon of Sunday, October 8th — three days before her death — to one Lontz. It will be unnecessary to detail here the substance of the statement further than to say that it tended to show that the shooting was intentional on the part of the accused, because the deceased had told the accused that it was all off between them. It appears quite clearly from the

evidence that the wound was so serious that there had been no hope of her recovery from the beginning. Before the declarations were received, there was evidence tending to show that the deceased on that day, and prior to making the statement, apparently understood what she was talking about; that several persons conversed with her besides the witness Lontz on matters requiring the exercise of memory and intelligence, such as the disposing of her belongings and her burial, and that she gave intelligent and conscious answers; that, although at times she seemed to be in a kind of a stupor, still, when her mind was aroused she was intelligent. This testimony came not only from the witness Lontz, but also from at least three other witnesses, two of whom were physicians, who saw and conversed with her on that day. In addition to these facts, Lontz testified that she told him that she knew that she could not get well and could not live long. This evidence was entirely sufficient as a foundation for the reception of the statement made. It tends to show that the statement was made while the deceased was intelligent and conscious, under the sense of impending death, which in fact soon took place. This satisfies the requirements of the law. *Miller v. State*, 25 Wis. 384; *Richards v. State*, 82 Wis. 172. The fact that other witnesses testified afterwards that she was delirious on Sunday, and did not know what she was doing, does not render the testimony inadmissible, but only affects the credibility of the statement.

3. The final objection made to the judgment is that the record does not show that the accused was present when the verdict was received, and hence, under the principles stated in *French v. State*, 85 Wis. 400, the conviction was erroneous and must be set aside. In that case the record did not show that the accused was present at any time during the trial, which lasted for several days, except when he was arraigned and pleaded; and hence it affirmatively ap-

peared that he was not present when the verdict was rendered, nor when sentence was pronounced. Under these circumstances it was held that the conviction was erroneous, that the record in capital cases must show the presence of the accused at the time of the rendition of the verdict and at the time of sentence, and that no presumption that the prisoner was present can be entertained if the record fails to show it. We shall test the present case by those rules. The clerk's record in this case shows that the trial began on November 23, 1899, and closed by the rendition of the verdict December 1, 1899. It affirmatively shows that the accused was present at the time of arraignment and plea, and at the opening of court, both forenoon and afternoon, on each day of the trial, up to and including the morning session of December 1st, at which time the jury were charged and retired. The record for the rest of the day reads as follows:

"In open court, December 1st, 1899, 2 o'clock p. m.

"*State of Wisconsin vs. William Hughes.*

"The jury, through Officer James Kane, intimated to the court that they desired to receive further instructions. Thereupon the court ordered the officer in charge to bring the jury into court. Jury appeared in open court at 4:20 o'clock p. m., and submitted two requests for instructions; defendant, *William Hughes*, defendant's attorney, John H. Vaughn, District Attorney Isaac Ross, and H. J. Loud, assistant district attorney, being present. Court ordered jury to retire, stating that it would take some time to prepare instructions as requested. Jury retired in charge of Officer Kane. Court ordered jury to be brought into court at 5:20 o'clock p. m., defendant, *William Hughes*, attorneys Vaughn, Ross, and Loud being present. The court further instructed the jury. Jury retires in charge of Officer Kane.

"December 1st, 1899.

"*State of Wisconsin vs. William Hughes.*

"Jury returned into court with the following verdict at 5:45 o'clock p. m.: 'We, the jury impaneled and sworn to try the issue in the above-entitled action, find the defendant guilty of murder in the first degree, as charged in the information. J. F. Huehle, Foreman.'"

The record then shows on December 4th and 5th follow-ing a motion for a new trial and the overruling thereof, and judgment on the verdict, at both of which times the accused was present.

The question is, Does the record, reasonably construed, show that the accused was present in court when the ver-dict was rendered ? We think it does. It certainly is not essential that the clerk shall enter the fact of the pris-oner's presence whenever a new witness is sworn or step taken in the case. If the record shows the presence of the prisoner at the opening of each session, with no intervening adjournments, it is quite clear that this is enough for that session. Thus, as a trial proceeds from day to day, with ordinary morning and afternoon sessions of court, the rule as to the record showing the presence of the defendant is satisfied if it shows his presence at the beginning of each session; not because any presumption is indulged in, but because the reasonable construction of the entry is, in the absence of anything to the contrary, that the prisoner was present during the session, and not simply at the moment the session began. Wharton, Cr. Pl. & Pr. § 551; *State v. Lewis,* 69 Mo. 92. Any other rule would require the clerk to be continually entering the presence of the defendant in order to keep jurisdiction. Now, in the present case it ap-pears that the accused was present at the opening of the morning session when the jury was charged; that he was present during the afternoon session, both when the jury came in with their request and afterwards when they came in for further instructions. It also shows, under all reason-able inferences, that the jury came in and rendered their verdict *during that very afternoon session,* only a few min-utes after they received the additional charge. We think the only reasonable and proper conclusion to be drawn from the record is that the prisoner was present during the entire afternoon session, during which session the verdict

was rendered, and that such conclusion does not require the support of any presumption.

There are no other assignments of error which require attention.

*By the Court.*— Judgment affirmed.