STATE EX REL. CATLIN, Appellant, vs. GALLIGAN, Respondent.

*May 4—May 21, 1918.*

*Quo warranto: Officers: Action to try title: Burden of proof: Elections: Qualifications of voters: Residence: "Habitation."*

1. In an action of *quo warranto* to try title to an office, the burden of showing that alleged illegal voters were at the time of the election not residents of the town in which they voted, is upon the party alleging that fact.
2. Evidence that single men, residents of the state, had for more than ten days prior to the election in question been actually employed as guards at the only manufacturing plant in a town, lodging, taking their meals, and keeping their clothes at the barracks provided for them inside of the grounds of said plant, and that at the time of the election each of them intended to continue such employment and remain in the town indefinitely or permanently, considered that town as his home, had no other home and no intention of removing from the town, had not come into the town for any temporary purpose, and was self-supporting, is *held* to sustain a finding by the trial court that they were residents of the town, within the meaning of sec. 6.51, Stats., and legal voters at said election.
3. The barracks in which said guards lived, having all the equipment and conveniences of the ordinary home, were a proper place for a habitation, within the meaning of sec. 6.51, Stats.

APPEAL from a judgment of the circuit court for Ashland county: G. N. RISJORD, Circuit Judge. *Affirmed.*

Action of *quo warranto* to try title to the office of chairman of the town of Barksdale and tried in the court below without a jury, a jury trial having been duly waived. The court found as follows:

That at the spring election of 1917 in the town of Barksdale, Bayfield county, the relator and defendant were candidates for chairman, the defendant being a candidate for re-election; that the canvassing board certified that the relator had received sixty votes at said election and the defendant sixty-one; that both qualified, and the defendant assumed

the office of chairman of the town, which office he has since held and now holds; that at said election the votes of a number of unmarried "guards" at the Dupont de Nemours Company's plant in said town were challenged for the alleged reason that they were not residents and not legally entitled to vote at said election; that the number set out in relator's complaint as having been illegal votes was somewhat over thirty, but upon the trial it was agreed that the only votes in question were those of Adolph Nelson, Albert Johnson, L. Olson, John McGilvary, Ben Hanson, P. Farley, Edgar Hunt, B. Hicks, Neil McIntosh, Dennis Kelly, Clarence Enhelder, Ben F. Ganski, and Chris Bekken, who voted for the defendant, and O. A. Olson, Fred Brace, Lewis Hanson, H. McCluskey, Lawrence Cox, Glen Kellar, J. O. Sabon, and Clyde Aitken, who voted for the relator.     On the trial it was further conceded by counsel for the relator that the votes cast by O. A. Olson, Fred Brace, and Lewis Hanson for the relator were illegal, and no evidence was offered as to the legality of the votes of H. McCluskey, Lawrence Cox, Glen Kellar, J. O. Sabon, and Clyde Aitken.     The relator's complaint, however, alleges that the votes cast by the last five persons named were illegal votes, so that it was conceded that the relator at any rate did not receive to exceed fifty-seven legal votes.     It was also conceded that the vote of Albert Zipperer, who voted for the defendant, had not been shown to be illegal, so the controversy hinges on the legality of the votes of the other thirteen above named who voted for the defendant.

That the said guards above named who voted for defendant were single men, and while employed as guards live in so-called barracks, which are buildings owned and controlled by the company and located inside of a wire fence surrounding the plant, and which barracks were fitted with places to eat, sleep, and bathe and with provisions for entertainment of the guards, consisting of card tables, books, etc.; that the barracks are used practically for the keeping of the guards only, and there is no access permitted to the barracks by any

one but the guards except upon permission given by the chief of the guards or the superintendent of the plant or other officer at the office of the plant located upon the grounds; that the barracks are not intended for occupancy by any one but guards and those employed there as cooks or otherwise, and when a guard's employment as such terminates he cannot make the barracks a home or place of residence; that the guards on duty are stationed at certain intervals along the wire fence surrounding the plant, and it is their duty to see that no one but employees or persons specially authorized enter the grounds inside of the fence; that said plant is located in the town of Barksdale and near a station called Barksdale; that most of the employees live at Washburn and are taken in and out by special trains, but some of the employees live in the neighborhood of the plant, mostly in the town of Barksdale, which town has no other industry of any consequence than the "Dupont plant" within its border, except farming; that the employment as guards at the plant is of indefinite duration and long service is encouraged in various ways by the company; that it seeks to obtain men who will remain permanently, and there is nothing to indicate how long the guards may be kept at the plant, but perhaps as long as the plant is running some guards at least will be retained; that the guards in question had no other domicile than the barracks and intended to remain at the barracks and in the company's employ as guards as long as the job lasted; that they are of various ages, all dependent upon their own earnings for their maintenance; that none of them who testified at the trial had a present intention to remove, though if their employment as guards terminated they would probably not remain in the town of Barksdale; that the fence had existed and guards had been employed for two or three years; that the company started out with about forty-five guards and at the time of the trial the number had increased to about eighty; that the plant was originally built for the purpose of manufacturing dynamite principally, but since the European

war started it has been largely engaged in the manufacture of war munitions.

That the foregoing facts apply generally to' all the guards above named who voted for the defendant, except that some of them had been at the plant longer than others, and the fol-lowing guards, namely, Albert Johnson, L. Olson, John Mc-Gilvary, Ben Hanson, Peter Farley, Neil McIntosh, and Dennis Kelly, voted in the town of Barksdale at the fall elec-tion of 1916 without their votes being challenged, while the others cast their first vote in the town at the spring election of 1917; and that they were all guards except Clarence En-helder, who was a cook at the barracks; that Albert Johnson, L. Olson, John McGilvary, Ben Hanson, Peter Farley, B. Hicks, Dennis Kelly, and Ben F. Ganski were still guards at the time of the trial of the action, while Adolph Nelson, Edgar Hunt, Clarence Enhelder, and Chris Bekken had left, all because of having been discharged, except Adolph Nelson, who left because he expected to be discharged; that all of them were employed by the company on the day of election, and all who testified upon the trial stated that they considered Barksdale and the barracks their home.

The court concluded that all of the thirteen guards above named who voted for the defendant were legal voters in the town of Barksdale at the spring election of 1917, therefore defendant received sixty-one legal votes and the relator not to exceed fifty-seven, consequently defendant has a legal right to hold the office of chairman of the town of Barksdale.

Judgment was entered accordingly, from which this ap-peal was taken.    The following · errors were assigned: (1) The court erred in holding that the thirteen guards who voted for defendant were legal voters; (2) in holding that defendant received sixty-one legal votes; (3) in holding that the defendant has a legal right to hold the office of chairman of the town of Barksdale; (4) in ordering judgment in this action for the defendant.

For the appellant there was a brief by *Sanborn, Lamoreux & Pray* of Ashland, and oral argument by *A. W. Sanborn.*

*Wm. F. Shea* of Ashland, for the respondent.

KERWIN, J.    The controversy here is over the legality of the votes of thirteen of the so-called guards employed at the Dupont plant.    The inspectors found that the defendant had received sixty-one votes and the relator sixty.    After the trial the court below found that the defendant had received sixty-one legal votes and the relator not more than fifty-seven. In his complaint the relator alleged that thirty votes cast for the defendant were illegal on the ground of nonresidence in the town of Barksdale of these voters.    Of these thirty voters it was conceded that thirteen voted for the defendant and eight for the relator, and that of the remaining nine four omitted to vote on chairmanship, three were conceded to be legal voters, and two were not challenged, and it did not appear which candidate they voted for, if for either.    Two of the thirteen voters in question had been at the plant upwards of two years at the time of trial, others were there throughout the same period.    Eleven of the thirteen were challenged at the polls and each swore in his vote.    Seven of the thirteen voted in the town at the general election in the fall of 1916. Seven of the thirteen were employed at the plant at the time of trial and testified for the relator.    One had enlisted in November, 1917, three were discharged in August, 1917, and two quit the employment in 1917.

The evidence of eight of the thirteen guards was produced by relator on the trial.    It showed that at the time of the election each was and for more than ten days had been actually employed in the town of Barksdale, working, lodging, and taking his meals and keeping his clothes at the barracks; that it was then his intention to continue such employment and remain in the town for an unlimited time, that is, indefinitely or permanently; that at the time of said election

he considered Barksdale his home and that he then had no other home and had no intention of removing from said town and had not come into the town for any temporary purpose. and was self-supporting and was not dependent upon his parents or any one else for support.    No evidence was offered to impeach the right to vote of the remaining five voters.

The sole question in this case is whether the alleged illegal voters were residents within the meaning of sec. 6.51, Stats.    The burden was upon the relator to prove that the thirteen voters were not residents.    *State ex rel. Hopkins v. Olin,* 23 Wis. 309; *State ex rel. Swenson v. Norton,* 46 Wis. 332, 1 N. W. 22.

The findings of the court below on this question are in favor of the defendant and cannot be disturbed unless contrary to the clear preponderance of the evidence.    *Mechanical A. Co. v. A. Kieckhefer E. Co.* 164 Wis. 65, 159 N. W. 557.

The thirteen voters in question were all guards at the Dupont plant, the only manufacturing plant in the town of Barksdale.    The plant had been in operation about twelve years, but its capacity had been largely increased since 1914, so that in 1917 about 1,500 men were employed.    In 1915 the plant was placed under guard, and at the time of the election in the spring of 1917 the thirteen were guards.    The guards whose votes are in controversy lived at the barracks inside of the grounds, were subject to strict discipline, and were under certain restrictions; they had lived in the state and at the barracks the requisite time to establish a residence; they had made the barracks their home.    There is evidence tending to show that they had no other home while they were thus employed, and their habitation was fixed at the barracks; that they had no present intention of removing or changing their place of habitation or going elsewhere to reside; that they had a home at Barksdale and intended to return there when absent.

The mere fact that the employment might end sometime in the future alone does not necessarily make the residence temporary. The barracks where the guards lived had all the conveniences and equipments of the ordinary home, hence were a suitable and proper place for habitation. One may have his residence at a hotel. *Hughes v. State,* 109 Wis. 397, 85 N. W. 333.

The question turns upon the proper construction of sec. 6.51, Stats. Sub. 2 of this section provides: "That place shall be considered and held to be the residence of a person in which his habitation is fixed, without any present intention of removing therefrom, and to which, whenever he is absent, he has the intention of returning." Sub. 4 of this section reads: "A person shall not be considered to have gained a residence in any town, ward or village of this state into which he shall have come for temporary purposes merely." And sub. 9 reads: "The mere intention to acquire a new residence, without removal, shall avail nothing; neither shall removal without intention."

Under these provisions counsel for appellant contends that, while the voters in question resided at the barracks for more than the period required by the statute, still they were not qualified voters. It is said by counsel that habitation means more than residence; that habitation is a place where a man lives as his home, his domicile. Many cases are cited by counsel from other jurisdictions. The cases outside of our own in the main define home, habitation, domicile, and residence, and are in harmony with the decisions of this court in so far as the statutes of other states on this subject are the same as ours.

Counsel relies strongly upon *State ex rel. Small v. Bosacki,* 154 Wis. 475, 143 N. W. 175, which was a case of temporary employment in the lumber woods. It clearly appeared from the evidence and findings that the so-called "lumberjacks" had no residence, home, or domicile at the camp where they

494 SUPREME COURT OF WISCONSIN. [MAY

State ex rel. Catlin v. Galligan, 167 Wis. 487.

were employed to work for the lumbering season. The evidence and findings showed that they regarded their employment temporary, and it was held that they could not gain a residence by simply being in the camp for a temporary purpose merely. The case is therefore distinguishable from the instant case.

Counsel also relies on *Seibold v. Wahl,* 164 Wis. 82, 159 N. W. 546, where the statutory rules, sub. 2, 3, 4, 5, and 9 of sec. 6.51, Stats., for determining the qualifications of electors are set out and applied to the facts in that case. The decision in that case is in harmony with the holding of the court below upon the evidence introduced in the instant case. At page 86 of 164 Wis. the court said:

"Applying, therefore, the standard of the statutory requirements with the aid of the light from the foregoing decisions, we find in the case at bar a student who registers from Camp Douglas, where his parents reside and to which place he returns as opportunity, his vacations, permit, and who is dependent, in part at least, upon that home for his support. His attending the university, therefore, is clearly for a 'temporary purpose merely,' under the fourth subdivision of sec. 6.51. All the facts are much more consistent with Camp Douglas being his home within the meaning of subdivisions second and third of the statute than with Madison being such home."

See, also, concurring opinion of WINSLOW, C. J., p. 87.

The findings of the court below are supported by the evidence, and under the statute and decisions of this court the judgment below is right and must be affirmed. Sec. 6.51, Stats.; *Miller v. Sovereign Camp W. O. W.* 140 Wis. 505, 122 N. W. 1126; *Seibold v. Wahl,* 164 Wis. 82, 159 N. W. 546; *Asbahr v. Wahl,* 164 Wis. 89, 159 N. W. 549; *Gross v. Wahl,* 164 Wis. 91, 159 N. W. 549.

*By the Court.*—The judgment is affirmed.

OWEN, J., dissents.