In re Burke: Brewer, Appellant, vs. Burke, Respondent.

*November 12—December 6, 1938.*

548

550

For the appellant there was a brief by *Vernon W. Thomson* of Richland Center, attorney, and *Crownhart & Murphy* and *J. H. Beuscher,* all of Madison, of counsel, and oral argument by *Mr. Beuscher, Mr. Thomson,* and *Mr. Robert B. L. Murphy.*

*Lorin L. Kay* of Richland Center, for the respondent.

NELSON, J. The respondent Burke first contends that no appeal lies from the judgment of the circuit court because sec. 6.66 (1), Stats., created a new remedy which provided for no appeal from the circuit court. Prior to 1935, sec. 274.09, Stats. 1933, provided:

"*Appeals to supreme court.* Appeals to the supreme court may be taken from the circuit courts and also from the county courts in counties having a population of over fifteen thousand except in cases where express provision is or may be made by law for an appeal to the circuit court, from such county courts and from any court of record having civil jurisdiction when no other court of appeal is provided by law. Appeals may be taken from interlocutory judgments, subject to the same limitations as from final judgments."

In 1922, in *Petition of Long,* 176 Wis. 361, 187 N. W. 167, it was held that the right of appeal is purely statutory,

and in cases where it is not given by the statutes it does not exist. In 1935, sec. 274.09, Stats., above quoted, was amended to read:

*"Appeals to supreme court, where allowed.* (1) Appeals to the supreme court may be taken from the circuit courts *unless expressly denied* and also from the county courts except where express provision is made for an appeal to the circuit court and from any court of record having civil jurisdiction when no other court of appeal is provided. Appeals may be taken from interlocutory judgments.

*"(2) Said right of appeal applies to final orders and judgments rendered upon appeals to review the proceedings of tribunals, boards and commissions, without regard to whether those proceedings involve new remedies or old ones."* Ch. 541, Laws of 1935.

The revisor's note states:

"The amendment is to change the rule followed in *Petition of Long,"* supra.

We think it clear that the legislature intended by the 1935 amendment to provide for appeals from judgments rendered upon appeals to review proceedings of boards.

It is contended by Brewer that the circuit court erred in finding, (1) that Orrin Fox and May Fox were residents of the town of Dayton at the time of the election; (2) in concluding that Orrin Fox and May Fox were entitled to vote at said election; (3) in concluding that the ballot marked with a cipher (○) opposite the name of Brewer and a cross (✕) opposite the name of Burke was a vote for the latter; and (4) in concluding that Burke was elected chairman of the town of Dayton at said election.

Burke moved for a review of the following findings of the referee which were approved by the circuit court: (1) That the ballot marked with a shaky hand and an imperfect cross showed an intent of the elector to vote for Brewer; (2) that the ballot which lacked the signature of one of the ballot

clerks cast for Brewer was a vote of an absent elector and should be counted for Brewer; (3) that the thirty-three ballots cast for Brewer, which had been used in the 1937 election, were ballots prepared for use in said last-named election *but not used,* that the said ballots were prepared and used in the 1938 election *with the consent of Burke,* that said ballots were prepared and indorsed so as to present to the electors the same list of candidates as in the 1938 official ballots, that the reason for the use of said ballots was explained to the electors and that the said thirty-three ballots were valid and legal ballots and should be counted for Brewer; (4) that Orrin Fox, May Fox, Wayne Fox, Delia Fox, and Blanche Hall were lawfully and properly challenged at the polls at said election; and (5) that Wayne Fox and Delia Fox were not residents of or voters in the town of Dayton at the time of said election.

We shall determine the several questions raised by the parties in the order which suits our convenience. Was the ballot which was marked with the cross ($\times$) opposite the name of Burke and a cipher ($\bigcirc$) opposite the name of Brewer properly counted for Burke? It is contended by the appellant that that ballot should be counted for neither because of the provisions of sec. 6.42, Stats., which in part provides:

"6.42 *Ascertainment of intent of voter.* All ballots cast at any election shall be counted for the persons for whom they were intended, so far as such intent can be ascertained therefrom. In determining the intent the following rules shall be observed: . . .

"(2) At all elections, whether general or other, when the voter shall place a mark against two or more names for the same office, when only one candidate is to be chosen for the office, he shall be deemed to have voted for none of them, and the ballot shall not be counted for either candidate therefor.

"(3) If an elector shall mark his ballot with a cross mark (✕), or any other marks, as

$$|, \text{A}, \text{V}, \text{O}, /, \surd, +,$$

within the square after, at the right of the name of any candidate, or at any place within the space in which the name appears indicating an intent to vote for such person, it shall be deemed a sufficient vote for the candidate whose name it is opposite."

An examination of that ballot reveals that the following instruction appears in bold type at the top of it:

"To vote for a person whose name is printed on the ballot, make a cross (✕) in the square after the name of the person for whom you desire to vote."

And also that the elector who cast that ballot marked it the same way in expressing his choice between four other sets of candidates for town offices. An examination of the forms of official ballots contained in the statutes reveals that the required instructions to the voters are not identical. The official state ballot contains the language:

"Mark in the square at the right of the name of the candidate for whom you desire to vote. . . ."

The official presidential ballot contains the language:

"Make a cross (✕) or other mark in the square," etc.,

as does the official referendum ballot. The official city ballot contains the language:

"Make a cross (✕) in the square after the name of the person for whom you desire to vote."

and the official judicial and school superintendent ballot contains the language:

"Mark with a cross (✕) in the square ☐ at the right of the name of the candidate for whom you desire to vote."

The board of canvassers, the referee, and the circuit court all concluded that the elector who cast that particular ballot

intended, by making a cross (✕) after the name of Burke, to vote for him. We think their conclusion should be upheld. Had the elector not consistently marked his ballot in the same manner all the way down, the matter of his intent might not be so free from doubt. It is our conclusion that this ballot was properly counted for Burke.

Was the ballot marked with a shaky hand and an imperfect cross after Brewer's name, properly counted for him? We think that the voter who cast that ballot clearly intended to vote for Brewer.

The vote cast by Blanche Hall for Burke is conceded by appellant to have been cast by a qualified elector who was over twenty-one years of age.

Was the ballot which lacked the signature of one of the ballot clerks, cast by an absent voter and properly counted for Brewer? Although the referee referred to that particular ballot as one that "lacks the signature of one of the ballot clerks," the ballot did not contain the signatures of any of the ballot clerks. It contained on the back thereof the name of the town clerk written in ink. The testimony taken before the referee shows that the only ballots cast at said election which were subscribed by the town clerk were absent-voter ballots. The evidence, in our view, sustains the finding that that particular ballot was cast by an absent voter and, under the law of *State ex rel. Symmonds v. Barnett,* 182 Wis. 114, 195 N. W. 707, it was properly counted for Brewer.

Were the fifty-four 1937 used ballots properly counted for Burke and Brewer? We have examined all of the fifty-four ballots and conclude that the electors who used them had no difficulty in expressing their choice of the candidates at said election. At that election, which brought out such an unprecedented number of electors, something had to be done by the election officials when the supply of official and sample ballots was exhausted. Had the election officers not afforded

the fifty-four electors an opportunity to vote, the whole election would probably have had to be declared invalid. Under all of the circumstances which tend to show that each and every ballot was carefully altered so that it corresponded with the official ballot, and acquiescence in the use of such ballots by both Brewer and Burke, it cannot be said that the electors who used them were prevented from expressing their intentions.

Were Orrin Fox and May Fox legal voters in the town of Dayton at the time of said election? The board of canvassers found that they were, the referee found that they were not, and the circuit court found that they were. Their ballots were marked by an election officer in purported compliance with the law relating to challenges. It is contended by the appellant that the circuit court erred in modifying the report of the referee in respect to Orrin Fox and May Fox because the findings of the referee in that respect were not against the clear preponderance of the evidence. We have carefully read all of the testimony adduced at the hearing before the referee, and conclude that the findings of the referee in respect to Orrin Fox and May Fox were against the clear preponderance of the evidence. It is the law of this state that the findings of a referee should not be reversed unless they are against the clear preponderance of the evidence. See 5 Callaghan's Wis. Dig. p. 4632, § 38. It is likewise the law of this state that the burden is on him who asserts the non-residence of a voter to prove such assertion. *State ex rel. Hopkins v. Olin*, 23 Wis. 309; *State ex rel. Swenson v. Norton*, 46 Wis. 332, 1 N. W. 22; *State ex rel. Catlin v. Galligan*, 167 Wis. 487, 167 N. W. 803. It is also generally held that when one has once acquired or established a residence such residence is presumed to continue until a new one is established. 20 C. J. p. 69.

It is undisputed that Orrin Fox and May Fox were husband and wife; that they had resided in the town of Dayton for thirty-five years; that they owned a farm in said town

containing about eighty-seven acres upon which were erected the usual farm buildings; that for about six years prior to said election Orrin Fox had been in poor health; that during that time the farm had been worked by his son, Wayne Fox, on a fifty-fifty basis; that shortly before the election Wayne Fox made up his mind to quit working that farm and to remove to another farm in another town where two of his brothers resided and to assist them in working that farm. Operation of the farm in the town of Dayton had not proved sufficiently profitable to Wayne to make him desirous of remaining there. So Wayne Fox and his wife moved to the brothers' farm on or about the middle of March, taking with them all of their personal property and belongings. The three sons wanted Orrin Fox and his wife to live with them on their farm. A room was prepared for their use. Orrin Fox was willing to live with the boys for a time to see if it would prove satisfactory. He leased his farmhouse in the town of Dayton for a period of eleven months, he leased the tillable land on shares to another, but retained all of his pasture land and reserved one room in the dwelling house in which to store temporarily most of his furniture. Commencing on March 23d, he and his wife slept at the boys' farm although between that day and the date of election he was at various times back on his home place. Orrin Fox voted at the town caucus and went back in the forenoon of election day to vote. At the trial before the referee Orrin Fox testified:

"Well, those boys had come together on that farm down there and they wanted some help on it which I gave them financially and they wanted me to come and stay there with them this summer anyhow, they didn't want me and my wife to stay over there alone."

He further testified:

"I had no arrangement with my son relative to my future position there. I have property at Dayton, personal property, and I expect to return there any day and work on that

farm. That is my home, and I own it, and I consider it to be my permanent home. I so considered it on election day and when I left there on March 29 I calculated to return any day I want to and I have that right, too. I reserved a room which is full of my personal belongings. I reserved it temporarily with the understanding there was no time set when they could have possession of it. . . .

"My purpose in going down there was because we was left alone, nobody with us over there, they didn't feel as though we was capable of looking after ourselves and didn't want to leave us alone and said, 'to come down here and stay with us.' . . .

"I expect to stay there mostly until the first of March. After that, when I get possession of the house, I can go back any day I want to. I haven't made up my mind exactly. That depends on what works out. . . .

"I left our home in Dayton for a temporary purpose. . . . I did not have a fixed habitation in Orion on April 5, and I did not have any present intention of moving away from Dayton and establishing a permanent home or residence elsewhere. . . .

"If we get along as good as we always have I can stay there if I want to, but I don't know if I want to."

Mrs. Fox testified :

"We went down there to help the boys out, whether we would live there permanently or not I don't know. As I said, I don't know whether we left for the purpose of remaining away permanently. I consider my home to be in Dayton. That is my home where I own is, and paid for. At the time of the election, I had not made up my mind to stay at Twin Bluffs permanently. My husband and I said we would go for a while, we might stay and might come back. We went with the intention of helping the boys establish a home. When I left Dayton I was just staying with my sons for a while, that is why we went down there, to make up our minds what we were going to do."

Notwithstanding these facts, the referee found that such residence had been lost. Most of the physical facts found by

the referee are wholly consistent with the expressed intention of Orrin Fox and his wife to retain their residence in the town of Dayton. In our opinion, the referee gave undue consideration to the testimony of several witnesses who related certain casual declarations made in their presence, mostly by Mrs. Fox, prior to her departure from the town of Dayton. One witness testified that she saw Mrs. Fox on or about March 27, 1938, and that Mrs. Fox at that time said:

"That they were moving away, but they had reserved a room on the farm for a time. . . . Mrs. Fox said they were too old to run the place and guessed they would have to leave. She said they were moving in with their sons."

On cross-examination the witness testified:

"I really didn't have anything to do with the conversation and I didn't know anything about their definite plans, only they were moving with their son. I *took* it they were going to move there definitely, but didn't say anything about it."

Another witness testified that he talked to Mrs. Fox on the 19th of March, and that she said "they were getting too old to work for themselves, and Wayne wasn't very well satisfied and wanted to make more money," that "the boys promised to take care of them and guessed they would, they always had been pretty good." Still another witness testified that he had a conversation with Mrs. Fox on March 19th, and that she told him "about the arrangements they were going to have at Twin Bluffs on the farm that they were moving with Don. She said the boys had been good to them and they were going down there." On cross-examination, that witness testified that Mrs. Fox "didn't say anything about moving away never to return. She didn't give me to understand that definite arrangements had been reached with her children. The way she talked I took the impression they were moving down there for as long as they could get along together, and if they liked it, to stay there the rest of their

lives and I suppose if they didn't like it they were going to come back." Still another witness testified that he had a conversation with Orrin Fox on March 17th, in which the latter stated that "Wayne wanted to get out and make some money himself and get a home and he couldn't stay there alone so they were all going to go on a farm Don had;" that he had "educated the boys and paid for the farm there, and all were down there together; he was going to stay with the boys the rest of his life." There is little of probative value in these casual declarations as compared with the express intentions testified to by Orrin Fox and May Fox, under oath, upon the trial. We think it clear that the only conclusion which may properly be drawn from all of the evidence is that Orrin Fox and May Fox intended to retain their residence in the town of Dayton until they were sure that living with the sons in the town of Orion would prove satisfactory to them. Had Orrin Fox sold his farm and removed from the town or had he lived with the boys for some considerable period of time a very different situation would exist.

Sec. 6.51, Stats., prescribes certain rules for determining residence as a qualification to vote. The following subsections are applicable:

"(2) That place shall be considered and held to be the residence of a person in which his habitation is fixed, without any present intention of removing therefrom, and to which, whenever he is absent, he has the intention of returning.

"(3) A person shall not be considered or held to have lost his residence who shall leave his home and go into another state or county, town or ward of this state for temporary purposes merely, with an intention of returning.

"(4) A person shall not be considered to have gained a residence in any town, ward or village of this state into which he shall have come for temporary purposes merely. . . .

"(7) The place where a married man's family resides shall generally be considered and held to be his residence; but if it is a place of temporary establishment for his family; or for transient objects, it shall be otherwise. . . .

"(9) The mere intention to acquire a new residence, without removal, shall avail nothing; *neither shall removal* without intention."

Those provisions are declaratory of the common law. *Miller v. Sovereign Camp W. O. W.* 140 Wis. 505, 122 N. W. 1126. Residence for purposes of voting is primarily a question of intention, but an expressed intention which does not harmonize with the physical facts and circumstances of the case is not controlling. *Seibold v. Wahl,* 164 Wis. 82, 84, 159 N. W. 546.

The appellant argues that the intention of Orrin Fox and his wife to retain a residence in the town of Dayton was simply a "floating intention" and cites *Felker v. Henderson,* 78 N. H. 509, 102 Atl. 623. The facts in that case were that the person whose residence for voting purposes was determined, resided in Ward 3 with his parents until he became twenty-one when he married and shortly thereafter lived in Ward 5 where he had his office and actual home. At the time of the trial he had lived in Ward 5 for fourteen or fifteen years. He testified that he intended to return to Ward 3 upon the happening of a certain event, but refused to state what that event was. Under those circumstances, it was held that he had no right to vote in Ward 3.

*City of Beardstown v. City of Virginia,* 81 Ill. 541, often cited, is authority for the proposition that one does not lose his residence by removal to another place with the intention of locating there if he can find a place to suit him, and upon being unsuccessful, returns to his former place of residence. Of course, if a person removes with the intention of remaining in another jurisdiction he thereby loses his residence, although he afterwards changes his mind and returns. *Treat v. Morris,* 25 S. D. 615, 127 N. W. 554. One who left the state of Missouri for Oklahoma in August, 1893, at the opening of that territory to settlement, took his family with him, and at the opening of the territory selected a claim, went

upon it to plow the land for a few days, and then learned that his homestead claim to the land selected was being contested, and who then abandoned the land and subsequently returned to Missouri, was held not to have lost his residence in Missouri. *Lankford v. Gebhart,* 130 Mo. 621, 32 S. W. 1127. In *Pye v. Hanzel,* 200 Minn. 135, 146, 273 N. W. 611, it was held that the ballot of one Blass cast in favor of the contestee was erroneously rejected. It was there said:

"It appeared that a few days before election Blass commenced to move from the precinct in which the vote was cast into another precinct. He had not completed the moving, but he had moved some of his furniture and his bed out of the precinct into the house which he had rented. He slept in this house two nights before the election. He voted in the precinct in which he had been living. He testified that he regarded the latter place as his place of residence and the place in which he was entitled to vote because he had not completed moving and still received his mail at that place. The fact that stands out is that the voter had not completed his moving from the old residence to the new one. In short, he had failed to acquire the new residence. Section 368 (9) provides that the 'mere intention to acquire a new residence, without the fact of removal, shall avail nothing; neither shall the fact of removal without the intention.' In this case there was a partial removal only, with intention to retain the old residence until the new one was acquired. Therefore, Blass' residence was at the place from which he was removing, and he was entitled to vote there. His vote was erroneously rejected."

The doctrine of that case is persuasive here, where Orrin Fox and his wife had been out of the town of Dayton only a few days prior to the election, and most of his furniture still remained on his farm in the town of Dayton. We conclude that the votes of Orrin Fox and May Fox were legal votes cast for Burke at said election.

Were the votes of Wayne Fox and Delia Fox properly held to be illegal votes? We have no doubt that the board of

canvassers, the referee, and the court properly found that they had lost their residence in the town of Dayton. All of the testimony tends to show that they had removed from the town of Dayton with the intention of acquiring a permanent residence in the town of Orion.

The respondent contends that the Foxes were not properly challenged, and therefore their ballots were improperly marked, permitting the election officers later on to identify them and treat them as contested votes. We consider it unnecessary to determine that question.

*By the Court.*—Judgment affirmed.