THE STATE EX REL. BELL, Appellant, vs. CONNESS, Respondent.

*March 21 — April 6, 1900.*

*Elections: Validity: Evidence: Certificate signed by one inspector: Ad-
missions of voters: Corrupt practices.*

1. A certificate of the result of an election which was signed by one
   inspector only, but had the name of another inspector written
   thereon by a person having no authority to do so, is not *prima facie*
   evidence of the facts therein stated, even conceding that the duty
   to sign the certificate might be delegated.
2. In an action to test the title to an office the exclusion of testimony of
   admissions made by voters as to their qualifications and for whom
   they voted is not error unless the offer thereof was definite as to the
   time when such admissions were made and as to their substance.
3. In an action to test the title to the office of town chairman, for which
   the relator received 253, and the respondent 262, votes, the court
   found that thirty-one of the votes cast were illegal, and it was rea-
   sonably certain that the illegal votes were largely in excess of that
   number. The evidence was insufficient to show that the relator was
   entitled to the office, but it appeared, among other things, that both
   the relator and the respondent connived to secure for themselves
   the votes of a large number of nonresidents employed in logging
   camps; that a large number of such men were paid, in the interests
   of defendant, for the time spent in going to the polls; that liquor
   was supplied to such an extent that hundreds became intoxicated
   and the polls were surrounded by a drunken mob; that these men
   were permitted by the inspectors to vote without challenge, al-
   though their ineligibility must have been known; that a number
   of residents were supplied with orders on the poor fund just before
   election, under circumstances giving rise to a just suspicion that
   it was done to influence votes; and that the respondent peddled a

"blue ticket" which seems to have been given prominence during electioneering and must have been prepared for some purpose of identification. *Held,* that the trial court should have declared the election void.

APPEAL from a judgment of the circuit court for Douglas county: A. J. VINJE, Circuit Judge. *Reversed.*

This is an action to test the title to the office of chairman of the board of supervisors of the town of Brule, Douglas county, Wisconsin. The election was held April 4, 1899. The official returns showed that defendant received 262 votes and relator 253. The complaint sets out a great many reasons why the election was illegal, in brief as follows: The election officers failed to put the proper questions to certain persons who were challenged. Men were permitted to vote who were not residents of the state or citizens of the United States. A large number voted who were not residents of the town, and some voted twice. The ticket prepared by the defendant was printed in blue ink. Voters were plied with whisky in the interest of defendant, and told to vote the blue ticket. Defendant made a corrupt agreement with one Colbrath, who was running a lumber camp, that the latter should bring in his men on election day and defendant should pay for their time; and men were kept after the logging season had ended, and taken to the polls, who were not voters. Financial help was promised certain residents of the town from the poor funds, as a means of procuring their assistance at the election for the defendant. Town orders were issued to certain claimants upon unfounded claims to induce them to favor the ring to which the defendant belonged.

A large amount of testimony was produced bearing upon the integrity of the election, and after the plaintiff had closed his case the defendant moved to dismiss the proceeding. The court took the matter under advisement, and finally made findings for defendant and directed a dismissal of the

complaint. The findings are to the effect that there were 515 votes cast, of which relator received 253 and defendant 262; that defendant was duly declared elected, and duly qualified for the office; that persons exceeding twenty-five in number voted, who were not residents of the town, five who were not residents of the state, and one who was not twenty-one years of age; that there was no proof for whom said persons voted; that said illegal votes were not procured to be cast or received by the defendant; that the officers of election acted in good faith; and that defendant was not guilty of fraud or bribery. The relator brings the case to this court for review on appeal.

For the appellant there was a brief by *A. B. Ross,* and oral argument by *Mr. Ross* and *Mr. B. W. Jones.*

For the respondent there was a brief by *C. R. Fridley* and *Thos. E. Lyons,* and oral argument by *Mr. Lyons.* To the point that evidence of statements of voters as to their qualifications to vote and how they voted, made to third parties after election, is inadmissible, they cited *Gilleland v. Schuyler,* 9 Kan. 569; *Beardstown v. Virginia,* 81 Ill. 541; *People ex rel. Dean v. Comm'rs of Grant Co.* 7 Colo. 190; *Patton v. Coates,* 41 Ark. 111; *Cessna v. Meyers,* Smith, Contested Elections in Cong. 60; *Newland v. Graham,* 1 Bart. Contested Elections in Cong. 5; *Att'y Gen. ex rel. Seavitt v. McQuade,* 94 Mich. 439; Cooley, Const. Lim. (6th ed.), 789–791; *People ex rel. Williams v. Cicott,* 16 Mich. 283; *Boyer v. Teague,* 106 N. C. 576; Payne, Elections, § 773; *Lauer v. Estes,* 120 Cal. 652; *French v. Lighty,* 9 Ind. 478; *Griffin v. Wall,* 32 Ala. 149.

BARDEEN, J. This case was decided upon the evidence offered by the relator, and the trial court found that he was not entitled to the relief sought. The certificate of the result of the election made by the inspectors was not *prima facie* evidence thereof. It was signed by but one of the in-

spectors. True, the name of another inspector appears thereon, but the evidence shows that it was written there by defendant, and no authority so to do was shown, even though it be admitted that such duty may be delegated. The inspector in question left the voting place before the certificate had been completed, and as he was about to go he turned to one of the other inspectors and said, "If there is anything in there for me to sign, you put my name to it." No request or direction was given defendant to sign his name. Hence it cannot be said that the certificate of the result of the election, signed by but one of the inspectors, is *prima facie* evidence of the facts therein stated.

Eliminating this certificate from our consideration, we have two claimants for office standing upon common ground. Both were seeking office, and both, as we shall see, used means to secure it that deserve the severest condemnation. It was conceded on the argument that the relator had not shown himself entitled to the office he claimed. He failed to show that he received a majority of the votes cast at the election, but he succeeded in showing a condition of affairs that taints the whole proceeding and calls for careful consideration. The purity and integrity of elections is a matter of such prime importance, and affects so many important interests, that the courts ought never to hesitate, when the opportunity is offered, to test them by the strictest legal standards. The case before us presents many vicious circumstances,— circumstances that indicate that the election was controlled and determined by men who had no semblance of right to vote, and who in turn were influenced and led by methods and means that ought to have no place in civilized society. There were cast at the election 515 votes. The proof fairly shows that there were not more than 275 to 300 legal voters in the town. At least two fifths of the votes cast were given by men who had no legal residence in the town, and who had no legal right to vote. The court

found that thirty-one of the votes cast were illegal. This conclusion was capable of absolute demonstration, but there was proof that a great many more were cast by men without the necessary qualifications. It is inconceivable how this fact could have escaped the notice of the officers of election. Sixty or more men were run in from one camp, the great majority of whom were shown not to have had a residence in the town, except for the temporary purpose of logging. On the way to the polls these men were met by others, who supplied them with what they called " *Conness* whisky," a commodity which seemed to be plentiful during the day. A short time prior to the election the defendant visited certain camps with a view of arranging to secure the votes of the men there located. The man in charge refused to allow him to go into the camps, but some arrangement was made by which the defendant was to pay a part or all of the expense of bringing them in. The defendant admits that *some* arrangement was made, but was not specific as to its terms. The fact remains that many of the men were paid for the time spent in going to vote, and were supplied with unlimited quantities of whisky. It is significant that Colbrath, the proprietor of the camps, was present at the polls and was an active partisan in the interest of defendant.

But there is another side to the picture. On the night preceding the election the relator visited the camps, and was received with greater hospitality than was accorded the defendant. He was permitted to communicate with the men, furnished them beer and cigars, and remained all night. Both of these men must have known that these men were not legal voters, and yet both were anxious to secure their votes and hoped they would get their share. This may account for the fact that no challenges were interposed when they came to vote. During the day whisky was so plentiful that one witness says there were at least 200 drunken men in the neighborhood of the polls. The relator admits having

furnished two bottles, besides giving money to one of his henchmen. Men working in the interest of defendant had ample supplies, and voters were invited to drink what they called " *Conness* whisky." It was so abundant and potent that it culminated in a stabbing affray in the vicinity of the polls. Another circumstance shown was that some half dozen or more able-bodied residents of the town were given orders on the poor fund just before election on recommendation of defendant or some one in his behalf. Some claim was made that town orders to voters were issued for road work with a prodigal hand, which were without merit, the inference suggested being that they were issued without proper scrutiny and to men active in the interests of defendant. The testimony on this branch of the case is, however, somewhat inconclusive.

It further appears that the tickets used by the defendant were printed in blue ink, and during the electioneering were referred to as the " blue ticket." There were six tickets in the field, and the only one with this peculiar color was the one used by the defendant. There can be but one possible explanation why this was done, and that is that it was for the purpose of furnishing the ignorant voter some means of identifying his ballot.

There are a number of other circumstances suggested in the brief of relator as bearing upon the conduct of the inspectors and the manner in which they made the count, and which it is claimed shows that the election was carried on in the interest of the defendant. In themselves they may not be sufficient to warrant a finding of absolute bad faith on the part of the election officers, yet they are sufficient to indicate that the election was conducted in a careless and slipshod manner, with scant regard to legal requirements. After the polls were closed, it was found that there were 515 names on the poll list, and only 513 votes in the box. Two votes were found folded together, which were taken

out and destroyed. The tally list shows 515 votes cast for the office of chairman, when there was in reality only 511 separate ballots. No one seems to be able to explain this discrepancy. This fact by itself would not avoid the election, but is mentioned as illustrative of the way the election was managed.

It is true, as the court found, the evidence fails to show for whom this vast number of illegal voters cast their votes. An attempt was made by the relator to offer testimony of admissions made by the voters as to their qualifications and for whom they voted. In each instance it was excluded by the court. We cannot say that such exclusion was error, because of the failure of the relator to make his offer sufficiently definite as to the time when such admissions were made, and as to the substance of such admissions. This court held, in *State ex rel. Hopkins v. Olin*, 23 Wis. 310, that when a witness refused to testify on the ground that his answers might tend to incriminate himself his admissions as to his qualifications and how he voted were proper to be shown. Testimony of this nature is admitted, contrary to the usual rules of evidence, perforce of circumstances, as being the best evidence obtainable. It goes in for what it is worth as tending to enlighten the court as to the situation, and is justified on the ground that its exclusion might defeat the ends of justice. No absolute rule as to its reception can be formulated. Much depends upon the circumstances of the case, as well as the circumstances of the admission. Care must always be taken in its reception lest some irresponsible voter, making admissions after a contest has arisen, be permitted to overturn an election by procurement or express design. As stated, the offers in this case were not sufficiently definite to make their exclusion error, yet they seem to emphasize the fact that very many of the votes cast were put in by voters who had no right to vote.

The State ex rel. Bell vs. Conness.

The defendant, not having a *prima facie* right to his office by virtue of his alleged certificate of election, was left in a position that would seem to call for some active effort on his part to support the integrity of the election. It was said in *State ex rel. Jones v. Oates*, 86 Wis. 634, that when one had been declared by the proper canvassing board to have been elected to an office, and had received the proper certificate, and had duly qualified, he had the *prima facie* right thereto. Sec. 804, Stats. 1898, provides that, after the canvass of the votes has been completed, and the result ascertained and determined by the inspectors, the clerk shall read to the meeting the names of the persons for whom votes for each office were given, and the number of votes given for each person, and the names of each person declared to be duly elected by the inspectors; and such reading shall be deemed sufficient notice to every person elected to any office at such meeting. There is no proof in this case that any such announcement was made, although one witness speaks of a final announcement as to the number of votes received by the relator. Assuming that the proper announcement was made, it is not necessary to determine whether that fact would give the defendant a *prima facie* right to his office or not.

We are faced with this situation: The court has found that thirty-one of the votes cast were illegal. It may be said with reasonable confidence that the votes cast exceeded the number of legal voters in the town by a number largely in excess of the number so found. We find both the relator and defendant conniving to secure for themselves the votes of a large number of nonresidents. We find the defendant entering into an arrangement with the foreman in charge of these men, which resulted in a large number being paid for the time spent in going to the polls. We find these men supplied with beer, cigars, and whisky to such an extent that hundreds became intoxicated, and the polls are surrounded

by a drunken mob. We find these men permitted to vote by the inspectors almost without challenge, although they must have known that many of them were ineligible. We find that a number of residents are supplied with orders on the poor fund just before election, under circumstances that give rise to just suspicion that it was done to influence votes. We find the defendant peddling a so-called "blue ticket," which seems to have been given prominence during the electioneering, and must have been prepared for some purpose of identification. All of these circumstances are vicious, and contrary to the spirit of our institutions. To permit such an election to stand requires us to shut our eyes to and excuse practices that ought always to receive the severest condemnation. When candidates for office connive at and election officers permit such wholesale illegal voting, the courts ought not to, and will not, hesitate to meet the conditions and furnish the proper relief. The circumstances of this case are so flagrant that we are compelled to disagree with the conclusions of the trial court. It being conceded that a large number of illegal votes were cast, it was his duty to adopt either one of the three following alternatives: (1) Declare the election void; (2) divide the illegal votes between the candidates in proportion to the whole vote of each; (3) deduct the illegal vote from the candidate having the highest vote. McCrary, Elections, § 497. Considering the circumstances surrounding the election as hereinbefore detailed, there was but one proper course to pursue. The relator had not shown himself entitled to the office. His conduct was little less reprehensible than that of the defendant. Hence the only proper alternative was to declare the election void. By so doing neither party is permitted to secure any advantage over the other, and the matter is relegated to the legal voters of the town, who ought to be permitted to exercise their rights, and make their choice of officers, without

being surrounded by influences so subversive of good government.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with directions to enter judgment declaring the election in question void.