STATE EX REL. SYMMONDS, Respondent, vs. BARNETT, Appellant.

*September 21—December 11, 1923.*

*Elections: Quo warranto by defeated candidate: Complaint: List of challenged votes: Sufficiency: Registration: Voting at primary: Poll lists: Failure of officials to initial ballots: Absent voters.*

1. A list of persons claimed to have voted illegally at an election, with an X-mark after particular names, attached to the complaint, and an allegation in the complaint that voters so marked voted illegally for the defendant, is a sufficient compliance with sec. 3468, Stats. 1921, requiring a complaint in *quo warranto* by a private person to determine the right to an office to state the names of the persons whom the relator shall claim voted illegally for the defendant.  p. 121.

State ex rel. Symmonds v. Barnett, 182 Wis. 114.

2. The complaint in this case states a cause of action to determine the title to an office by a defeated candidate under sec. 3468, Stats. 1921, and not an action by the relator as a disinterested private person to prevent the defendant from usurping a public office under sec. 3466, notwithstanding the failure of the complaint to pray for a judgment declaring the relator to have been elected.  p. 123.

3. Under secs. 6.16, 6.17, and 6.49, Stats. 1921, an elector who goes to the primary election and convinces the election officers that he is a qualified voter in the district, which fact is evidenced by the reception of his ballot, has registered as a voter in the district in so far as it lies within his power to so do; and he· is entitled to vote notwithstanding the failure of the registration board to enter his name on the registration lists.  p. 126.

4. A voter is not to be deprived of his constitutional right of suffrage through the failure of election officers to perform their duty, where the elector himself is not delinquent in the duty which the law imposes upon him.  p. 127.

5. In a *quo warranto* proceeding involving the validity of ballots cast for the office of district attorney, evidence consisting generally of testimony of election officials would justify a finding that unindorsed ballots were those of absent voters deposited in the ballot box, under sec. 11.62, without indorsement by the ballot clerks.  p. 131.

6. Failure of the ballot clerks to indorse the ballots of absent voters deposited in the ballot box under sec. 11.62 did not affect their validity under sec. 6.41, making unindorsed ballots void, such statute not applying to absent voters.  p. 132.

JONES and CROWNHART, JJ., dissent in part.

APPEAL from a judgment of the circuit court for Kenosha county: E. B. BELDEN, Circuit Judge. *Reversed.*

*Quo warranto.* The relator and defendant were opposing candidates for the office of district attorney of Kenosha county at the 1922 general election. The original canvass of the votes gave relator, *Frank S. Symmonds,* a majority of twenty-one. A recount demanded by defendant, *Morris Barnett,* under the provisions of sec. 6.66, Stats., gave *Barnett* a majority of two votes. Another recount, pursuant to a demand by *Symmonds,* gave *Barnett* a majority of one vote. From this determination *Symmonds* appealed to the circuit court for Kenosha county pursuant to the

provisions of sec. 6.66, Stats., where it was determined that *Barnett* was duly elected by a majority of twenty votes. A certificate of election was duly issued to *Barnett,* who qualified for and took possession of the office.

On or about the 8th day of February, 1923, the plaintiff instituted these proceedings to oust the defendant and have himself installed in the office of district attorney. The complaint alleges, in substance, that the relator was appointed to the office of district attorney in July, 1921, to fill a vacancy caused by the resignation of the then district attorney; that he duly qualified for said office pursuant to appointment, and that he has ever since been and still is, as he verily believes, the district attorney for Kenosha county. It then alleges the holding of the general election, the count and recounts of the ballots, as above set forth. That the circuit court referred the matter to a referee, who segregated 127 questioned ballots; that of said 127 questioned ballots, 12 were counted for defendant and 14 for the relator. The others were not considered. Relator then alleges that out of the 127 questioned ballots, 61, which had theretofore been counted, were not counted by the referee because they were not properly identified by the initials or names of the election officials, and the same being, as relator is informed and verily believes, absent voters' ballots; that of these 61 absent voters' ballots, 34 were cast for the relator and 14 for the defendant, while the 13 remaining were blank as to district attorney; that adding these 34 ballots for relator and the 14 for defendant to the respective number of 4,429 for relator and 4,409 for the defendant, it would give 4,453 for each of the said candidates, leaving several doubtful votes out of the remainder of the said 127 votes, yet to be determined as to the intention of the voter.

It is further alleged that at all times during the canvass of the said ballots and in making up each and every final determination, the board of county canvassers as well as the referee erroneously included in each of said counting of votes upwards of 600 votes which relator claimed to be il-

legal for the reason that the said alleged illegal votes were cast by persons not duly registered, "nor did they produce any proper affidavit of their proof of right to vote, or in any manner qualify as electors by way of giving such proof of their right to vote as required by law, and particularly was this true in the Sixth and Eighth wards of the city of Kenosha, in the said general election held in November, 1922;" that of the said illegal votes or ballots, 463 were cast in the Eighth ward and 120 in the Sixth ward of the city of Kenosha, making a total of 583 illegal votes which were illegally voted, accepted, and counted in said election, as per list of names attached to the complaint.

The complaint further alleges that

"The said 583 illegal votes as were so cast, received, and counted in said Sixth and Eighth wards are more than sufficient to change the result of said November election, but it is impossible, by using due diligence, to actually determine for whom all such illegal voters cast their said ballots; that there are at least 144 ballots in the Eighth ward and at least thirty-eight in the Sixth ward that are blank as to district attorney; many voters do not remember how they voted, or whether they voted at all for district attorney; and some voters at said election have since died, and the number of said illegal voters is so large that it is impossible with the exercise of due diligence to know or to determine with any degree of certainty just for whom each of the said named illegal voters so cast his ballot for district attorney; that of said 583 illegal votes and ballots there should be determined the proportionate number of such illegal votes for each candidate in each of said wards to be deducted from the whole number of votes cast for the said relator and said defendant respectively; that in the said list of 583 names of illegal voters as is hereto attached and aforementioned, there are certain names marked with a cross (X) mark before each such name and which relator claims are, among many others so named in said list, the names of persons who so voted illegally for said defendant."

It is also alleged:

"That on the 30th day of January, 1923, this relator caused to be duly served on defendant a due and proper

State ex rel. Symmonds v. Barnett, 182 Wis. 114.

notice as required by law, that relator would claim in this action that certain votes cast in the Sixth ward as well as in the Eighth ward of said city were illegal, and therewith caused to be served upon the said defendant a list of names setting out the names of each such illegal voter so casting such illegal vote, giving the poll-list number as well as the street address as written therein.   That such list contained the names of voters in the said Sixth ward and illegal voters in the Eighth ward of said city of Kenosha which were at said general election unlawfully received, voted, counted, and included in determining defendant's alleged election, and that the certificate of election upon which defendant bases his claim for the office of district attorney thereby does not speak the truth of the result of said election."

The complaint then goes on to allege various discrepancies between the number of voters shown on the poll lists and the number of ballots found in the ballot boxes, and continues:

"That besides the above irregularities there were at least twenty-six illegal votes cast by parties who offered supposed affidavits at different voting precincts, which said supposed affidavits were not made up according to law and lacked such material information as that they could legally be accepted, and that each party named in each of said affidavits were not properly registered voters and have not presented proper affidavits as required by law, yet said persons were permitted to so vote and their said illegal votes were received and counted as though legal votes by the said board of county canvassers as well as in the said appeal in the circuit court.   That among other material defects in the said affidavits, the following are set forth, viz.: in five of the proposed affidavits the voter failed to sign his name; in fifteen there was an omission in each of the voting precinct, either by the voter, freeholder, or both; in one affidavit the notary had not signed either affidavit; in five the affidavit of one of the two freeholders signing as freeholder and also signed as the notary before whom each of the said freeholders took oath."

The complaint then alleges defendant's failure to qualify within the time required by law, and that

"On the first Monday of January, 1923, the said defendant usurped and intruded into the said office of district attorney of said county and has ever since unlawfully exercised the same and excluded relator therefrom and withheld and still withholds the same from him, together with the emoluments thereof and the privileges thereto belonging."

The prayer for judgment is as follows:

"That the said defendant, *Morris Barnett,* be adjudged guilty of usurping, intruding into, and unlawfully holding the said office of district attorney and that he be excluded from the same and the privileges and franchises thereof, and that his alleged certificate be declared void and of no effect; that said *Frank S. Symmonds* be entitled to have, hold, and exercise said office as the duly qualified district attorney for Kenosha county, Wisconsin; that said election be declared void; that said *Frank S. Symmonds* recover the costs of this action against said *Morris Barnett,* defendant; and for any further order, relief, or judgment which the court shall determine is just and proper under the circumstances."

The case was tried before the court. It was found that 118 persons in the Sixth ward and 460 persons in the Eighth ward voted who were not duly registered and who did not produce to the election officials, when they voted, affidavits as required by law in proof of their right to vote. These votes were apportioned to each candidate according to their total vote in each of said wards and deducted therefrom. The result gave *Barnett* 4,001 and *Symmonds* 4,197 votes. As conclusions of law the court found that the relator, *Frank S. Symmonds,* was duly elected to the office of district attorney for Kenosha county, state of Wisconsin, at the last general election, held in Kenosha county on the 7th day of November, 1922, and is entitled to have and

to hold said office and exercise its duties and functions by virtue of said election; that said defendant *Morris Barnett* does not lawfully hold and is not lawfully entitled to hold said office of district attorney for Kenosha county, and should be ousted and excluded therefrom.

From such judgment the defendant appealed.

For the appellant there was a brief by *Stewart & Vaudreuil,* attorneys, and a separate brief by *Edward J. Reutz,* of counsel, all of Kenosha, and oral argument by *Mr. Calvin Stewart* and *Mr. Reutz.*

*Frank S. Symmonds,* attorney, and *John F. Kuehnl,* of counsel, both of Kenosha, for the respondent.

The following opinion was filed October 16, 1923:

OWEN, J.    Ch. 149 of the Statutes relates to actions of *quo warranto.*   Sec. 3466 thereof provides that an action may be brought by the attorney general in the name of the state upon his own information, or upon the complaint of any private party, against the parties offending in the following cases:

"(1) When any person shall usurp, intrude into or unlawfully hold or exercise any public office, civil or military. . . ."

The same section also provides that "such action may be brought in the name of the state by a private person on his own complaint when the attorney general refuses to act or when the office usurped pertains to a county, town, city, village or school district."   Sec. 3468 specifies certain allegations necessary in the complaint, in the following language:

"In all actions brought to determine the right to any office it shall be necessary for the plaintiff or relator in every case where the defendant is in possession of the office in controversy, under a certificate of election issued by the proper officer or board of canvassers, to state in his com-

State ex rel. Symmonds v. Barnett, 182 Wis. 114.

plaint in what respect such certificate was improperly or illegally issued; and in case it is claimed that the relator received a majority of legal votes cast for the office at any legal election to fill such office he shall also state in such complaint the actual number of legal votes cast for the relator and for the defendant for such office respectively, and also the number of votes cast for the relator and for the defendant respectively for such office, as determined by the legal canvass of such election, and shall also state the names of the persons whom such relator shall claim voted illegally at such election for the defendant, which were canvassed, and in what such illegality consists and the election district where such illegal votes were cast; and the plaintiff and relator shall, upon the trial of any such action, be confined and restricted to proof as to the illegality of such alleged illegal votes so specified and shall not be permitted to give evidence of any other illegal votes than those so specified."

It will be observed that the statute requires a relator who claims to have received a majority of legal votes at an election to state the names of the persons whom such relator will claim voted illegally at such election for the defendant, and upon the trial he shall be confined and restricted to proof as to the illegality of such alleged illegal votes so specified and shall not be permitted to give evidence of any other illegal votes than those so specified. From the very beginning the defendant has sought to apply this provision of the statute to the relator and confine his proofs of illegal voting to those names actually specified by him in the complaint as having voted illegally for the defendant. This question was raised by demurrer to the complaint as well as by demurrer *ore tenus* upon the trial, both of which were properly overruled. It will be remembered that there was attached to the complaint a list of 583 names whom it was claimed voted illegally at the election. A cross-mark (X) was placed after sixty-four names, the complaint alleging that the voter so marked voted illegally for the defendant. These allegations, we hold, complied with the statutory

provisions above quoted, as to the sixty-four voters, and rendered the complaint sufficient upon demurrer.

By objections consistently interposed during the trial defendant sought to limit the proof of illegal voting to the sixty-four names so marked. The court received the evidence subject to the objection, but it is apparent that in the final disposition of the case he disregarded such objections and considered all of the evidence received tending to establish illegal voting on the part of several hundred others than those indicated by the cross. It is necessary that we first consider whether this ruling constituted error. On the part of the relator it is contended that he did not seek to establish the fact that he received a majority of the legal votes cast for the office of district attorney at the election; that he brought the action as a private person to establish the illegality of defendant's election and the fact that he was a usurper in the office.

The statute unquestionably lays a burden upon a relator who claims to have received a majority of legal votes at the election that is not imposed upon the attorney general, or other private person, who may bring the action. This is a deliberate legislative provision and was no doubt enacted for a purpose. The legislature perceived a clear distinction between an action brought by the attorney general or by a disinterested private person to vindicate public interests, and an action brought by a defeated candidate to establish title to an office. The strict provision requiring the latter to "state the names of the persons whom such relator shall claim voted illegally at such election" was no doubt inserted for the express purpose of discouraging the bringing of such actions where the compelling motive was the establishment of private rights rather than the vindication of public interests.

It will thus be seen that whether this action is brought by the relator in the one or the other capacity is of most significant importance. The relator points to the fact that

the complaint does not ask for a judgment declaring him to have been elected to the office of district attorney, but that the purpose of the action is merely to establish the illegality of defendant's title to the office. A consideration of the complaint as a whole ill conceals the relator's personal interest in the controversy and quite as futilely reveals, as an impelling motive, the purpose of redressing the grievances of an outraged public. In the first place, relator starts in to lay broad and sure the foundations of his own claims to the office by alleging his appointment and qualification as district attorney and the fact that his term of office extended until the first Monday of January, 1923, and until his successor qualified. What place does such an allegation have in a complaint by the attorney general or by one seeking to vindicate only public interests? Then he alleges "that of said 583 votes and ballots there should be determined the proportionate number of such illegal votes for each candidate in each of said wards to be deducted from the whole number of votes cast for the said relator and said defendant respectively." To say the least, that is a peculiar allegation in a complaint on behalf of the public to set aside the result of a fraudulent election. And a part of the prayer for relief is "that said *Frank S. Symmonds* be entitled to have, hold, and exercise said office as the duly qualified district attorney for Kenosha county, Wisconsin." One cannot avoid the conclusion that this action would not have been sponsored by the relator were it not for the private interest involved.

It is true relator adroitly avoids any claim that he received a majority of the legal votes cast at the election for the office of district attorney. But the proceedings have, nevertheless, eventuated in a judgment to that effect, and he has been adjudged duly elected to the office of district attorney at the last general election and is entitled to have and to hold such office and exercise its duties and functions by virtue of said election. Now, bearing in mind that the

legislature deliberately required a relator claiming to have received a majority of legal votes cast for an office to "state the names of the persons whom such relator shall claim voted illegally at such election for the defendant," and confining him to such allegation in his proof, may an unsuccessful candidate escape such burden by yielding any claim that he himself received a majority of the legal votes, and introduce proof *ad libitum,* take a chance that the court will prorate the illegal votes between him and the successful candidate and install him in the office, as was done here upon the authority of *State ex rel. Bell v. Conness,* 106 Wis. 425, 82 N. W. 288. We believe that the judicial sanction of such a proceeding would point the way for unsuccessful candidates to avoid the duty imposed upon them by the legislature for the plain purpose of discouraging such proceedings where public interests are not involved and thwart the rather plain purpose of the statute. A defeated candidate by proceeding indirectly should not be permitted to avoid burdens which he must assume if proceeding directly. We therefore hold that the relator should have been confined in his proofs to the sixty-four voters whom he alleged in his complaint to have voted illegally at the election.

We now come to consider the question of whether the sixty-four persons so designated did vote illegally at the election. It is claimed their votes were illegal because their names did not appear upon the registry lists. This fact is not disputed. But it is claimed that, nevertheless, they were duly registered voters. This claim is based upon the fact that each of the sixty-four voters did vote at the preceding primary election. This, it is claimed, constitutes registration, and that if their names did not appear upon the registry lists it was due to the inattention or negligence of the registration officers, which cannot supervene to deprive the otherwise qualified voter of his constitutional right of suffrage. Conceding that these names were not upon the registry lists, we proceed to inquire, first, whether they in

State ex rel. Symmonds v. Barnett, 182 Wis. 114.

fact registered, and second, if they did register, did the absence of their names from the registry lists render their votes illegal under the circumstances hereafter appearing.

Sec. 6.16, Stats., relates to the registration of voters. By that section and by sec. 6.17 it is provided that primary election day, the Tuesday next preceding such primary, and the Tuesday next preceding the general election shall be registration days; at its first meeting the registration board shall make a registry of all the electors residing in its district; the poll lists kept at the last preceding election shall be delivered to the board for use in making such registry, "which shall contain the names of all persons residing in the district which appear on said lists, together with the name of every person known by the board to be an elector of the district, and also the name of every person who shall on any registration day appear and file an affidavit stating that he is a qualified elector in such district and giving his place of residence;" the board shall complete such registry as far as practicable at its first meeting and make necessary corrections at every subsequent meeting. By sec. 6.17 it is provided that the board shall hold a final meeting on the Tuesday next preceding the general November election and on no other day. By sec. 6.49 it is provided:

"At every poll where a registry of electors is required, every elector at the time of offering his ballot shall truly state the street and number of the house or tenement, if numbered, or other location, in which he resides, and the clerks of election shall truly enter in the appropriate column of the poll lists, opposite his name, the street and number or other location of such house or tenement, or the name of the hotel or boarding house, and if such house or tenement be not numbered the clerks shall enter 'Not numbered.' If any elector offering to vote at any such poll shall refuse to make such statement, his ballot shall not be received. The clerks shall also enter upon the poll lists, opposite the name of every elector so voting whose name was not duly registered, the words 'Not registered.' "

It is to be noted that there is nothing very formal about the preparation of the registration lists. In the first place, the registration board is required to enter on said lists the name of every person who voted at the last general and municipal elections. They shall also put on said list the name of every person known by the board to be an elector of the district, and also the name of every person who shall on any registration day appear and file an affidavit stating that he is a qualified elector in such district and giving his place of residence. Primary election day is a registration day. It is conducted by the same officers who prepare the registration lists. One may not vote at the primary election without proving to the satisfaction of the election officers that he is a qualified voter in the district. When he so presents himself to vote at the primary election he shall truly state the street and number where he resides. If he is not registered that fact shall be entered opposite his name on the poll lists by the election clerks. Sub. (6) of sec. 6.16 requires the registration board to enter on the list the name of every person known by the board to be an elector of the district. Sub. (8) of said section requires the board to complete said registry as far as practicable at its first meeting and make necessary corrections at every subsequent meeting.

These provisions plainly make it the duty of the registration board, either at its meeting on primary election day or at its following meeting on the Tuesday next preceding the general election, to enter upon its registration lists the name, of every person who voted at the primary election whose name was not previously upon such registration lists. When the elector goes to the primary election and convinces the election officers that he is a qualified voter in the district, which fact is evidenced by reception of his ballot, he has most effectually, so far as it lies within his power, or so far as it constitutes his duty, registered as a voter in that district. If his name does not thereafter appear upon the

registration lists it cannot be attributed to any dereliction on his part, but is due solely to the negligence or inattention of the registration board. In the instant case, the sixty-four voters alleged by the relator to have voted illegally in the Sixth and Eighth wards of the city of Kenosha did in fact vote at the primary election. As a matter of fact the registration board made no effort, and did not pretend, to complete the registration lists by inserting thereon the names of those who voted at the primary election but who were not previously registered. In the conduct of the election they treated the poll list of the primary as a part of the registration list. As so used it amounted to what was held to be a *de facto* registration list in *State ex rel. Wood v. Baker*, 38 Wis. 71. Were the votes cast under these circumstances illegal?

It was squarely held in *State ex rel. O'Neill v. Trask*, 135 Wis. 333, 115 N. W. 823, citing earlier Wisconsin cases, that the registration laws constitute a reasonable regulation of the right to vote; that such provisions are mandatory; and that one whose name is not on the registration list should not be permitted to vote unless he supplies the affidavits required by statute of unregistered electors. The language of that decision should of course be construed with reference to the facts there under consideration. In that case two unregistered electors presented insufficient affidavits upon which they were allowed to vote. The court held their votes invalid. We have no disposition to recede from the doctrine of that case as properly understood. But at this point we must bear in mind another well settled legal proposition. As a general rule a voter is not to be deprived of his constitutional right of suffrage through the failure of election officers to perform their duty, where the elector himself is not delinquent in the duty which the law imposes upon him. *State ex rel. Wood v. Baker*, 38 Wis. 71; 9 Ruling Case Law, 1093.

In the *Trask Case* (135 Wis. 333, 115 N. W. 823), the

electors not having been registered it was necessary to furnish the proof of their right to vote in the form required by statute. It was their duty to procure and present proper affidavits. This they failed to do. They were not deprived, therefore, of their right to vote through the negligence of election officials but rather because of their own failure to comply with the law. In this case the electors whose right to vote is challenged in fact registered. In this respect they complied with all requirements of law and responded fully to their legal duty. They appeared before the registration board and established their status as electors in that district. They had a right to assume that their names were properly upon the registration lists. If they were not on such lists it was through no dereliction of theirs. The election officers themselves regarded them as registered. They treated the poll list of the primary election as a sort of a supplement to their registration list, and had it at the general election polling place for use as reference. These voters deposited their ballots with never a thought that they were not entitled to vote. Had their vote been refused because they were not so registered a different situation would be presented. In that case it was still possible for them to qualify themselves to vote by presenting the proper affidavits. However, they had every reason to suppose that they were qualified to vote. The election officers regarded them as qualified to vote. Their votes were received without any intimation that they were not qualified to vote and without any opportunity for them to present qualifying affidavits.

The record shows that there were 118 voters in the Sixth ward and 460 voters in the Eighth ward of Kenosha in this situation. It is not pretended that any of them were not qualified voters in their respective wards. To uphold the contention of the relator is to disqualify 578 voters in these two wards, not by reason of any dereliction on their part but because the election officers failed in the performance of their legal duty. To construe the registration law in

a manner to accomplish this result is to place our registra-
tion regulations perilously near the border line of uncon-
stitutionality.　It is said that the voter has an opportunity
to consult the posted registration list with a view of ascer-
taining whether his name appears thereon, and, if it be not
there, he may qualify himself to vote by procuring and
presenting to the election officers the proper affidavits.　This
argument was disposed of in *State ex rel. Wood v. Baker,*
38 Wis. 71, at p. 88, in the following language:

> "It was said upon the argument that the voters whose
> names were on the registers in the several wards in question
> were bound to inspect the registers and to discover their
> apparent defects.　We cannot think so.　We need not pass
> upon the questions whether voters at an election have a right
> to inspect the registers used, or whether notice of defects
> of form in the registers would impair the right to vote with-
> out proof. Because we hold that voters are not bound to
> examine the registers, if they can, as a condition precedent
> to voting without proof; and that voters whose names are
> on a register *de facto,* used by the inspectors at the election
> as official and valid, need not inquire further.　They may
> accept the registers *de facto,* as they accept the inspectors
> *de facto.*　And they are no more bound to inquire into the
> qualifications *de jure* of the registers than into the qualifica-
> tions *de jure* of the inspectors.　It is enough for voters
> to find at the election acting inspectors using actual registers
> *virtute officii.*　They need look no further to see if their
> votes be challenged by statute.　The statute cannot challenge
> them without notice.　Their constitutional right cannot be
> baffled by latent official failure or defect.　And the registry
> law sets no such trap, authorizes none such, for the con-
> stitutional right which it was passed to protect."

We are clear that the votes of those under consideration
should not be held illegal.　We therefore hold that the
ballots of the sixty-four electors whose votes were put in
question by relator's complaint should have been counted,
and that the court erred in treating the 538 votes similarly
situated as illegal and apportioning them between the relator

and defendant in proportion to the total number of votes received by them in the respective wards.

This conclusion is in strict harmony with *State ex rel. Wood v. Baker,* 38 Wis. 71, and is no more in conflict with *State ex rel. O'Neill v. Trask,* 135 Wis. 333, 115 N. W. 823, than the *Baker Case* was in conflict with *State ex rel. Doerflinger v. Hilmantel,* 21 Wis. 566, and *State ex rel. Bancroft v. Stumpf,* 23 Wis. 630. As we adhere to the ruling in the *Trask Case,* so did the court in the *Baker Case* adhere to the doctrine of the *Hilmantel* and *Stumpf Cases.* The difference between the situations presented in this and the *Baker Case* and the situations presented in the other cases is that in this and the *Baker Case* no negligence is to be imputed to the voter and he was chargeable with no knowledge that his qualification to vote had not been properly proved. As said in the *Baker Case* (p. 87):

"Nonfeasance or malfeasance of public officers could have no effect to impair a personal, vested, constitutional right. We see no such purpose in the registry law. Surely it would be a strange attempt to protect the elective franchise and preserve the purity of elections, to put it in the power of inspectors of election, by careless accident or corrupt design, to disfranchise constitutional voters. That, we take it, would be the actual effect of avoiding elections where the inspectors use defective or irregular registers at the election, as official and valid; so entrapping voters into dispensing with proof of their right, required and authorized only when their names are not registered at the election. We cannot think that such is a necessary or admissible construction of the statute."

This brings us to another question. It appears that the referee appointed by the circuit court to canvass the votes, rejected and did not count a considerable number of ballots which were not indorsed by the ballot clerks. These were considered defective ballots by the referee. Upon the trial considerable evidence was introduced tending to show that such defective ballots were cast by absent voters. This

evidence, speaking generally, consisted of testimony on the part of election officers from the various election districts to the effect that ballots received from absent voters were not indorsed by the ballot clerks but they were deposited in the ballot box as required by sec. 11.62, Stats., and that the number of unindorsed ballots found in the ballot box corresponded to the number of absent voters. We think this evidence would justify a finding that the unindorsed ballots were those of absent voters. But we are not clear as to whether the trial court in fact so found. The disposition of the case by the trial court gave the relator such a large majority that the court found it unnecessary to consider many irregularities which the relator pressed at the trial. After finding that the defendant had received 4,001 votes and the relator 4,197 votes, and after apportioning and deducting the illegal votes in the manner above stated, the trial court in his findings of facts says:

"To these totals might be added the following absent voters' ballots: in Pleasant Prairie, 3 for defendant, 8 for relator, 3 blank; in Somers, 2 for relator; Second ward, 4 for relator; Third ward, 2 for relator; Fourth ward, 5 for relator; Sixth ward, 2 for relator; or, a total of 3 for defendant and 23 for relator. The court finds, in view of the foregoing result in the foregoing summary of votes cast for each party hereto in said seventeen precincts above mentioned, that it is not necessary to consider the trifling difference between the number of votes found in the ballot boxes and the number of persons' names found on the poll lists, or is it necessary to reject votes where voters used defective affidavits, or to add the number of absent voters' ballots as above found, for their total would not change the result as above determined. The court also finds that it is necessary to inquire for which candidate votes illegally received were marked and counted. The court also finds that the number of votes illegally received in the Sixth and Eighth wards being so large and their illegality so obvious that it is quite unnecessary to take into consideration the other and smaller irregularities or to inquire for whom persons voting illegally cast their ballots."

If these ballots be counted and added to the votes of the parties hereto, as found by the referee, it will result in a tie vote between the parties to this proceeding. There will then remain the other irregularities mentioned in the finding of the trial court above quoted to be disposed of. We must determine whether the unindorsed ballots, if it be found that they were voted by absent voters, should have been counted. It will be noticed that the provision of sec. 3468 which we hold required relator to state the names of the persons whom he claimed to have voted illegally at such election for the defendant does not apply to the count and canvass of the ballots. The question here is, Should the ballots be counted?—not whether the voter casting the ballot was a qualified elector. Sec. 6.41 provides that any ballot which is not indorsed by the signature or autograph initials of the ballot clerks shall be void, not counted, and be treated and preserved as a defective ballot. This is a rather imperative statute. But for the very same reasons which prompted our conclusion upon the question already discussed, we think it should not be held to apply to absent voters' ballots. To so apply the statute would be to disfranchise a qualified voter through the negligence of the election officers, and, as said in *State ex rel. Wood v. Baker*, 38 Wis. 71, 89, "Their constitutional right cannot be baffled by latent official failure or defect." The voter who presents himself at the polls has an opportunity to examine his ballot and see that it is properly indorsed by the ballot clerks. The absent voter receives his ballot from the county clerk, at which time it is not indorsed. The indorsement of the ballot is a duty which the election officers are required to perform after the ballot has left the hands of the voter and at a time when he is not present to see that the duty is performed. The indorsement of the ballot, therefore, is not within his power to demand or compel. In

order that the constitutional right of the voter shall not be abridged by official dereliction and without any negligence on his part, it is necessary to hold that sec. 6.41 does not apply to absent voters, and that such unindorsed ballots as the court may find upon competent evidence to be the ballots of absent voters should be counted.

This is about as far as we can go with the case. We have discussed such concrete questions as are disclosed by the record which are material to a disposition of the case. It would seem that it is now necessary for the trial court to consider other irregularities which at the time of the disposition of the case in that court were deemed of too trifling a nature to affect the result. We do not think a new trial necessary. The court should make further findings upon the record as it exists and enter the proper judgment pursuant to such findings.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion.

The following opinion was filed November 13, 1923:

Jones, J. (*dissenting*). In that part of the opinion of the court which construes the statutes relating to the registration of voters I cannot agree.

In *State ex rel. Doerflinger v. Hilmantel,* 21 Wis. 566, 544 persons voted whose names were not on the register and who had not furnished the affidavits required by the statutes. There was no attempt to evade the requirements of the statutes, no fraud or misconduct on the part of any of the persons voting. They were qualified electors, except that their votes were not received in the form prescribed by the statutes. In the opinion of the court it was said that as to all the voters the inspectors may have acted on their own knowledge of the facts and thought that proof was

unnecessary.    In the opinion by Mr. Chief Justice Dixon he said that he had first entertained the view that the statute was directory and not imperative, and then added:

"For the sake of justice, upon the facts here pleaded, I regret that this act does not admit of the same construction.    It seems certainly a very severe regulation which excludes the votes of legally qualified voters under such circumstances.    But, on examining the act, I am satisfied that it cannot be so construed.    It is essentially an imperative statute, and deprives the inspectors of all jurisdiction to receive the votes of unregistered voters, unless the conditions as to the affidavit and oath are fully complied with."
Page 570.

It was held that by the act every voter is made or may become an agent in the execution of the law.    After summarizing the provisions of the statute it was said (p. 571):

"In this matter of a voter whose name has been omitted, and who has not appeared on the day for the correction of the register, the burden of answering the requirements of the law by furnishing the affidavit and proof is thrown upon the voter himself.    He is presumed to know the law and must go to the polls prepared to comply with its conditions; and if he does not and his vote is lost, it may, so far as it is the fault of any one, with justice be said to be his own fault.    It is in the nature of a penalty imposed by the law for his neglect to do what is required of him.    The inspectors cannot receive his vote, and if they cannot, it cannot afterwards be received and counted by the courts."

After illustrating from other statutes that abuses cannot be guarded against nor rights preserved by statute without resorting to proceedings more or less formal, the opinion continued (p. 572):

"The disability or disfranchisement is inseparable from the necessary protection; perhaps it may be said that the protection can only be afforded by imposing the disability.    Hold the act to be directory, and allow the electors to vote without their names being registered, and without the affi-

davit and oath prescribed in case they are not, and the object
of the legislature would be entirely defeated. The effect
of such construction would be fatal to all protective· legis-
lation, and would leave the election laws precisely as· they
stood before this statute was enacted."

In *State ex rel. Bancroft v. Stumpf,* 23 Wis. 630, in one
precinct there was no registry of voters and none of the
persons voting furnished the affidavits prescribed by law.
It was held that their votes should not have been received,
following the case above cited.

In *State ex rel. O'Neill v. Trask,* 135 Wis. 333, 115 N. W.
823, the inspectors received votes of persons who were
qualified electors except that they were not enrolled on the
registry of electors. They presented affidavits, attempting
to comply with the registry law, but the affidavits were
defective. It was held immaterial that the affidavits pre-
sented to the inspectors were the only form furnished and
available to the voters, since it devolved on the voter to
present proper affidavits showing the facts which entitled
him to vote.

It was urged in that case that the voters acted in good
faith in attempting to comply with the statute; that the
fault if any was that of the inspectors in receiving the votes
without notifying the voters of the defects. In the opinion
by Mr. Justice SIEBECKER the court said:

"The argument is made that the statute is merely direc-
tory in requiring an elector to make proof in the manner
therein prescribed that he is a qualified voter, and that, since
Mr. Townsley and Mr. Kailin were in fact electors and
residents of this district, their votes should not be rejected
after having been received by the inspectors, although they
failed to make proper proof of their qualifications. · The
language of the statute is in clear and positive terms to the
effect that no vote shall be received if the name of the per-
son offering to vote is not on the registry, unless he furnishes
the proof required by the statute showing his right to vote.
The terms of the statute clearly manifest a legislative intent

that votes of persons offering their ballots shall not be received unless they establish their right to vote by being on the registry, or, if not registered, then by making proof before the inspectors of election as required by the statute. The object of the statute is to prevent fraudulent voting by persons who assume the right when in fact they are not entitled to it. We discover no good reason for departing from the decision of this court of an early day wherein it was held that under the statute enacted for the protection of the elective franchise, declaring in imperative terms that the ballots of unregistered electors should not be received unless they made proof of their right to vote, in conformity with the statute, the inspectors were deprived of all jurisdiction to receive them. *State ex rel. Doerflinger v. Hilmantel,* 21 Wis. 566. This conclusion was expressly adhered to in *State ex rel. Bancroft v. Stumpf,* 23 Wis. 630, and in the *Baker Case* [38 Wis. 71]. We are persuaded that the statute before us in no way renders compliance with the law impossible or impracticable, and that it imperatively imposes a duty on the unregistered elector to show his right to vote in the manner prescribed by the statute before his vote can legally be received by the inspectors of election." *State ex rel. O'Neill v. Trask,* 135 Wis. 333, 338, 115 N. W. 823.

In the present case reliance is placed on *State ex rel. Wood v. Baker,* 38 Wis. 71. In that case there were gross irregularities on the part of the inspectors in making up the registry. But there was a *de facto* registry used by the inspectors, and the voters used and relied on it as the official and regular list. The voters had no notice of these irregularities. They voted without any warning of any kind that proof of their right to vote was required by law. The names of those who voted were on this *de facto* list. One of the candidates whose office was in question at the time of the canvass was county clerk, and he had been one of the officials who had helped make the registry of voters which he asked to operate so as to disfranchise the voters. He was also one of the board of county canvassers. By

the decision he was ousted from office and fined for his
misconduct.  It was held that the case was wholly unlike the
*Hilmantel* and *Stumpf Cases* above cited, and these cases
were not overruled.  In the opinion the court said (p. 85):

"It is true that the registry law provides for great public·
ity of the process of registry and of the registers themselves,
throughout the process; and fully authorizes voters to ex-
amine and criticise the registers and propose corrections of
them, during the process of registry.  So much so, that it
is said in *State ex rel. Doerflinger v. Hilmantel,* 21 Wis.
566, that every voter is made or may become an agent in the
execution of the law; and added, that in case of a voter
whose name has been omitted, the burthen of answering
the requirements of the law by furnishing affidavit and
proof is thrown upon the voter himself, who is presumed to
know the law and to go to the polls prepared to comply
with its conditions.  And in *State ex rel. Bancroft v.
Stumpf,* 23 Wis. 630, the same rule is applied to elections
where there is no register of voters at the election.  But all
this implies notice to voters that their names are not on the
register, or that there is no register *de facto,* at the election;
so that they have an opportunity, if they will, to remove
the difficulty, each voter for himself, by complying with the
statutory conditions.  In such case, if a voter be dis-
franchised, he is by his own omission a voluntary party to
his disfranchisement.  But that cannot be said where the
inspectors have a register *de facto,* which they use as official
and valid, on which the voter's name is found, and of whose
irregularities and defects he had no notice."

And further (p. 87):

"If a voter's name be not on the register at an election, he
is in effect challenged by the statute, and required to furnish
prescribed proof of his right. . . . These requirements are
not unreasonable, and are consistent with the present right
to vote, as secured by the constitution.  The statute imposes
no condition precedent to the right; it only requires proof
that the right exists.  The voter may assert his right, if he
will, by proof that he has it; may vote, if he will, by reason-
able compliance with the law.  His right is unimpaired;

and if he be disfranchised, it is not by force of the statute, but by his own voluntary refusal of proof that he is enfranchised by the constitution."

In that case the voters had no way of ascertaining that the registration was irregular and did everything in their power to enable them to cast legal votes. The fault was solely that of the inspectors. In the present case the registration lists were regular in every respect, but the voters in question utterly ignored the fact that their names were not included. The distinction between the two cases seems to me to be very plain.

In the case at bar it was conceded that the registration was regular and that the lists of registered voters were duly posted as the statute requires. It is true that the day for the primary election is also one of the days for registration, but it is only one. The primary was held nearly two months before the election and the registration list was subject to correction up to the Monday next preceding the election. There was no proof that any of the voters in question asked to be registered on primary day, and no reason to suppose that any of them went for any purpose except to vote at the primary. There is no evidence that any of them used or consulted the poll lists as registration lists, or for any purpose.

I shall not quote at length the many sections relating to registration of voters nor undertake to state their substance. Sec. 6.44, Stats., provides:

"On general election day the inspectors shall designate two of their number, at the opening of the polls, who shall check the name of every elector voting in such district whose name is on the registry. Any person whose name is not on the registry, but who is a qualified voter therein shall, nevertheless, be entitled to vote at such election upon compliance with the following provisions, *and not otherwise,* namely: . . ."

Then follows the clause for making proof by affidavit of non-registered voters.

State ex rel. Symmonds v. Barnett, 182 Wis. 114.   Dissent.

It is very plain that the provisions relating to the poll lists and the registry lists are entirely distinct and for different purposes.   While the poll lists at the last preceding general election and municipal elections are to be used by the board of inspectors in making the registry list, there is no provision by statute that the poll lists of the preceding primary are to be used for that purpose.

Sec. 6.17, Stats., provides for the final meeting of the board of registry and for changes in the registry list by addition and erasure of names, showing plainly that the poll list used at the primary is not to be accepted as the test of qualification for voting at the general election.

The statute provides that within two days after every primary copies of the registry list shall be printed, not exceeding one hundred, and six copies shall be posted in public places in the district.   Care is taken in the statute that these lists shall be so printed that the voters on each street may easily examine them.

This publicity enables every person intending to vote to easily ascertain whether his name is on the lists, and every person interested can investigate whether other names on the list are properly there.   Thus there is given the opportunity to prevent fraud, which, in populous cities, may be very important.   After all the changes and corrections have been made, the statute provides that the board shall post five copies of the registry in five public places in the district.

It was the theory of the appellant's counsel that if one in fact an elector has his vote accepted at the primary he is entitled to vote at the following election although his name is not on the registry; that in such case the primary poll list is the registry.   It seems to me that the theory that the voter has no other responsibility than to appear and vote at the primary in order to be eligible to vote at the general election is out of harmony with the decisions of this court continuing through many years.

Such a theory seems to me contrary to both the letter and meaning of the many sections providing for registration, in

that it places the whole duty and responsibility of the election on the election inspectors and absolves the voter from all obligation to observe the law intended to preserve the purity of elections.

Under former decisions it has been held that the duty to register is imperative, and that since the voter is an agent in the execution of the law he cannot complain if he fails to comply with the statutory requirements.

In warmly contested elections large numbers of voters come to the polls and go in quick succession. In the present case many names of non-registered voters were placed on the poll lists on the assumption that the inspectors knew they were qualified electors, often a mistaken assumption.

I cannot agree that the mere offer and reception of a vote and placing the name of the voter on the poll list amounts to registration, or that the poll list thus becomes the registration list.

In a careful opinion the trial court expressed the view that the provisions of the registry law are for the purpose of guarding and preserving the integrity of elections, and that the provisions should be strictly upheld. With that view I fully agree. In the present case large numbers of votes were cast by those who were not registered. They were cast and received through the joint carelessness of the inspectors and the voters. In another case they might be counted by reason of the joint fraud of the voters and the inspectors.

I fully agree that the constitutional right of suffrage is to be cherished and protected; but that right is of little value if legal votes may be nullified by illegal votes, and the right of suffrage can only be protected by prevention of its abuse.

I agree that the votes of the absent voters should be counted. They had done everything in their power to comply with the statute. The failure to indorse the ballots was solely the fault of the election officers, one which the absent voters could in no way prevent, and on account of

J. F. Rappel Co. v. Manitowoc, 182 Wis. 141.

which they should not be disfranchised.  Their situation is plainly distinguishable from that of the non-registered voters who had every opportunity but neglected to comply with the statute.

I am authorized to state that Mr. Justice CROWNHART concurs in this dissent.

A motion for a rehearing was denied, with $25 costs, on December 11, 1923.